UNITED STATES of America, Appellee,

v.

Jeffrey Allen MARTIN, Appellant.

No. 88–1313.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 21, 1988.

Decided March 13, 1989.

Thomas M. Kelly, Minneapolis, Minn., for appellant.

Richard L. Murphy, Asst. U.S. Atty., Cedar Rapids, Iowa, for appellee.

Before ARNOLD and MAGILL, Circuit Judges, and ROSS, Senior Circuit Judge.

MAGILL, Circuit Judge.

Jeffrey Allen Martin was convicted in the district court[1] of one count in violation of 21 U.S.C. § 841(a)(1), possession with intent to distribute 100 grams or more of the Schedule II Controlled Substance phencycli-

---

1. The Honorable David R. Hansen, United States District Judge for the Northern District of Iowa.

dine, known in the narcotics vernacular as PCP or angel dust. The court sentenced Martin to fifteen years imprisonment and imposed a $10,000 fine. On appeal, Martin contends that he is entitled to a reversal of his conviction (or, in the alternative, a new trial) and resentencing. Having carefully considered Martin's arguments and the record on appeal, we affirm.

## I. BACKGROUND

Martin is a twenty-nine-year-old businessman from Minneapolis. His businesses consist of rental properties and an assortment of coin-operated machines. He is married with a three-year-old child.

For approximately thirteen years, Martin has used PCP, a crystalline substance that users often smoke (either alone or sprinkled into substances like tobacco or marijuana). In 1987, the year of the arrest giving rise to his conviction, Martin used PCP daily. He asserts that he habitually smoked one gram per day of PCP in "rock" form (undiluted by other substances). His persistent drug abuse prompted him to embark on four attempts at rehabilitation and provoked his wife to separate from him approximately six months before his arrest.

While Martin was working during the early afternoon of October 7, 1987, Dennis Goff came to visit him, accompanied by a woman named Michelle Robinson. Martin had met Goff approximately three months earlier at the residence of a Minneapolis dealer from whom both men had made numerous drug purchases. PCP was scarce in Minneapolis at the time, so Goff proposed that Martin join him in a California buying trip. Martin agreed to go along. He arrived at the Twin Cities airport that evening with $1,500 in cash and flew west with Goff, Robinson, and Robinson's friend Nicole Lemke.

The foursome rented a Lincoln Town Car when they reached California. They planned to purchase PCP from a drug-dealing acquaintance of Goff's and then drive back to Minneapolis.

The drug purchase took place in Chino, California. Shortly after midnight on October 8, the foursome reached the dealer's home. After Martin and Goff sampled the product with the dealer, the foursome spent the night in a nearby hotel. The next day, Martin and Goff purchased two sixteen-ounce soft drink bottles containing $2,000 in liquid PCP.

The foursome then began the return trip to Minnesota. On the road, all four sampled the PCP Martin and Goff had purchased. Since liquefaction of the drug reduces its potency, twice the normal dosage was required to equal the pure "rock" PCP Martin was accustomed to smoking. By the time the foursome were stopped by the police on October 12, they had consumed three ounces from the original purchase, with twenty-nine remaining.

During the morning of October 12, the foursome were travelling north on Interstate 35 in Hamilton County, a rural section of central Iowa. Iowa State Patrol Trooper Howard Hollander noticed in his rearview mirror that the Lincoln was weaving and speeding. The Lincoln veered onto the right shoulder of the highway and then careened across to the left side. Hollander allowed it to pass him. He then signalled for the Lincoln to pull over.

The driver of the Lincoln, Jeffrey Martin, appeared to be intoxicated. When he produced his Minnesota driver's license, Hollander observed Martin's bloodshot eyes, slurred speech and overall unsteadiness. Hollander smelled no alcohol on Martin, but the semi-conscious condition of the three passengers in the Lincoln reinforced his belief that inebriation had caused the reckless driving. Goff produced a fraudulent identification card that indicated he was a Californian named Harris.

Hollander led the staggering Martin to the patrol car. Martin failed each of three routine sobriety tests, unable even to recite the alphabet. Hollander next considered how to move the Lincoln and take the foursome into custody. He radioed for the assistance of a local deputy sheriff and placed Martin under arrest for reckless driving and driving while intoxicated. He soon discovered that Goff's averred identity was false, so he arrested Goff for sup-

plying false information to a police officer and for public intoxication. The trooper apprised Martin and Goff of their *Miranda* rights. Neither Michelle Robinson nor Nicole Lemke was arrested.

Before the Lincoln was towed for safekeeping, Hollander and the deputy sheriff began to inventory the contents of its passenger compartment. As they did so, Ms. Lemke requested permission to remove some of her belongings from the trunk. When she opened it, Hollander noticed the two soft drink bottles stored amid various articles of clothing. When questioned as to the bottles' contents, Ms. Lemke replied, "Seven–Up and Sprite." Ms. Lemke lifted one of the bottles from the trunk and appeared deliberately to drop it on the pavement. The fall did not shatter it. Hollander opened it and detected an ether-like odor.

Martin, Goff, Lemke and Robinson were taken to the stationhouse in Webster City for continued investigation and processing. Martin asked permission to contact his lawyer. Still inebriated, he could not remember the lawyer's phone number. He called his father instead and was overheard saying he was "too high to remember" his home phone number. Soon thereafter, when his three companions were all unconscious or asleep, Martin revealed the content of the soft drink bottles, calling it his personal stash.

At Martin's trial, a drug enforcement agent named Overbaugh was called by the government as an expert witness. Although he had performed approximately eighteen years of DEA service, it was revealed during the trial that Overbaugh had no experience with liquid PCP and that he had not been assigned to a case involving any form of PCP for seven years.

Martin objected to some of Overbaugh's testimony, but made no blanket objection to the agent's qualifications as an expert. Overbaugh testified, *inter alia*, that one gram of PCP per day is probably the outer limit for one person's usage. He also covered the price of PCP, its primary sources, and the correlation between PCP's solid and liquid forms.

## II. DISCUSSION

■ As we indicate above, the district court record, contrary to Martin's arguments calling for reversal of his conviction or, in the alternative, resentencing, does not support the conclusion that the district court's conviction and sentencing of Martin was clearly erroneous. Although we do not find Martin's defense meritorious, several points he raises require examination and discussion.

First, we address whether Martin's cache of PCP reached the statutorily required quantity. 21 U.S.C. § 841(a)(1) applies only to possession with intent to distribute PCP equalling or exceeding 100 grams. The record in this case vacillates between the British (ounces) and metric (grams) systems of weight measurement when discussing the PCP discovered in the two soft drink bottles. Nevertheless, it is manifest that Martin's stash of PCP exceeded the statutory amount. The confiscated twenty-nine ounces of liquid in the soft drink bottles exceeded 800 grams of diluted PCP which, if purified, would equal approximately 200 grams of PCP.[2] As this quantity doubles the statutory amount, Martin's claim that § 841 was improperly applied is incorrect.

■ Second, we disagree with Martin's assertion that a reasonable jury would doubt whether Martin possessed the drug with intent to distribute. The standard of review for this inquiry is whether, when viewed in the light most favorable to the government, there is substantial evidence to support the jury's verdict. *United States v. Wesley*, 798 F.2d 1155, 1157 (8th Cir.1986). The government is entitled to all reasonable inferences that can be drawn from the evidence, *id.*, and the court must assume the truth of the government's evidence, *United States v. Young*, 702 F.2d 133, 137 (8th Cir.1983).

2. This amount, when broken down into individual doses, totals (assuming that each dose equals 5 milligrams) 160,000 doses diluted or 40,000 doses purified.

Martin made no effort to refute the indications in the record that Martin and Goff provided PCP to Michelle Robinson and Nicole Lemke, their female companions. Thus, the jury needed to look no further than the backseat of the rented Lincoln to find substantial evidence that Martin possessed the PCP with intent to distribute. In addition, we note that the Eighth Circuit is among the many courts that have recognized that juries may infer intent to distribute solely from a defendant's possession of an unusually large quantity of drugs. *See United States v. LaGuardia,* 774 F.2d 317, 320 (8th Cir.1985) (jury verdict of possession with intent to distribute justified when quantity in question was eighteen ounces of cocaine). Because of the large quantity of PCP possessed by Martin (*see supra,* n. 2 for approximate single dosage breakdowns) and the indications that he did in fact distribute PCP to the two women, we cannot conclude, viewing the evidence in the light most favorable to the government, that a reasonable jury would doubt Martin's culpability under § 841.

■ Third, we find no reversible error in the district court's admission of government exhibit no. 1, the liquid PCP seized on October 12, 1987. Defense counsel in the district court created some confusion by making a pretrial motion in limine to suppress the PCP (alleging that it was obtained by the government via an illegal search) and then subsequently stating, "I have no objection * * *," when it was offered into evidence at trial. This sequence of events raises a question this court addressed recently in *United States v. Roenigk,* 810 F.2d 809, 815 (8th Cir.1987): must an objection made in the pretrial stage be restated at trial in order to preserve the issue for appeal. However, we need not grapple with this question because the warrantless search of the Lincoln and the subsequent seizure of the PCP were lawfully conducted in accordance with the plain view exception to the warrant requirement imposed by the fourth amendment of the United States Constitution.

The plain view doctrine (first enunciated by the United States Supreme Court in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion)) provides that when police, with prior justification for arrest or intrusion, inadvertently discover articles with immediately apparent evidentiary value in plain view, they are free to seize them without a warrant. *Id.* 403 U.S. at 466, 91 S.Ct. at 2038.

■ The facts here clearly fall under the plain view exception. Hollander and the deputy sheriff were performing valid post-arrest duties when Ms. Lemke opened the trunk and revealed the bottles of PCP. As *Texas v. Brown,* 460 U.S. 730, 741, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983), holds, police need not be certain that an article has evidentiary value; probable cause is sufficient to justify seizure. Again, the apparent intoxication of the foursome and Ms. Lemke's attempt to destroy the bottle gave Hollander probable cause to suspect the presence of illicit drugs, so the district court's admission of the liquid PCP was not reversible error.

■ Finally, we do not believe it was error for the district court to admit Overbaugh's testimony. Numerous Eighth Circuit opinions hold that the decision whether to admit or exclude expert testimony must be left to the sound judicial discretion of the trial courts; we must refrain from reversing trial courts' decisions concerning the admissibility of expert testimony on appeal unless we find them "manifestly erroneous." *See, e.g., United States v. Kelly,* 679 F.2d 135, 136 (8th Cir.1982); *United States v. Oliver,* 525 F.2d 731, 737 (8th Cir.1975); *United States v. Wiebold,* 507 F.2d 932, 935 (8th Cir.1974). Moreover, despite his objections to some of the content of the agent's testimony, Martin made no objection to Overbaugh's qualifications as an expert. Without a timely, contemporaneous objection at trial, a party cannot preserve an issue for appeal, *United States v. Roenigk,* 810 F.2d at 815 (8th Cir. 1987), and this court cannot reverse on appeal unless we find "plain error." *Id.; United States v. Garcia,* 785 F.2d 214, 220

(8th Cir.1986); · *United States v. Resnick,* 745 F.2d 1179, 1183 (8th Cir.1984).[3]

 As our discussion of the background of this case reveals, Overbaugh, because of his limited work involving PCP and its derivatives, may not have been the optimum source of information about the drug and its forms, sources, price, and dosages. However, he is unquestionably an experienced DEA employee with a wide range of experience and training. The Federal Rules of Evidence authorize all testimony by qualified experts that "will assist the trier of fact." Fed.R.Evid. 702. We do not find "plain error" in the district court's conclusion that Overbaugh's testimony assisted the jury. His testimony covered a broad range of issues unfamiliar to lay people. We conclude that his testimony on the forms, sources, price, and dosage units of PCP did assist the jury and therefore was properly admitted.

Since there was no objection at trial to Overbaugh's qualifications and his testimony was relevant, based on a wealth of experience, and helpful to the jury, we find no plain error in its admission.

## III. CONCLUSION

For all the foregoing reasons, we affirm the judgment of the district court in all respects.

---

**3.** The plain error rule discourages "sandbagging" stratagems by counsel by making it far more difficult to obtain a reversal when no contemporaneous objection is made. Because there was no objection at trial, Martin must establish more than mere reversible error: he must show (1) that the district court erred; (2) that the error had a substantial adverse effect on his rights; and (3) that the result of the error was a miscarriage of justice. *See Resnick, supra,* at 1183.