[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14640
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 24, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00415-CR-CG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KINGSLEY LYDELL WRIGHT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(April 24, 2009)

Before BIRCH, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

Kingsley Wright appeals his convictions for conspiracy to distribute and

possess with intent to distribute 50 grams or more of cocaine base and two counts

of possession with intent to distribute cocaine base, as well as the forfeiture of his

property, pursuant to 21 U.S.C. §§ 846, 841(a)(1), and 853.  He asserts that the

district court erred by denying his motion to suppress all evidence resulting from

the search of his house.   We find that the officers' testimony regarding their search

of Wright's house was not unbelievable and that they were legally in the house.

The district court's denial of Wright's motion to suppress is AFFIRMED.

## I.  BACKGROUND

In January 2008, law enforcement officers from the Mobile County Sheriff's

Office ("MCSO") Narcotics and Vice Unit ("MCSONVU"), the Alabama Alcohol

Beverage Control Board Enforcement Division ("ABCED"), and the United States

Marshal's Service arrived at Wright's home to serve him with an arrest warrant.[1]

As the officers approached the home, MCSO Deputy Raylene Busby observed

Wright, who was standing on his porch wearing only blue jeans, turn, walk back

towards the house, and reach for the door "as if he was going to go inside."  Doc.

44 at 37, 44-46, 54.  Busby admitted that, although her filed report stated that

Wright "walked back into the kitchen" of the residence, she did not see him

---

[1]  The arrest warrant was based on a search of Wright's home in July 2007 when crack cocaine and marijuana were discovered.  Wright pled guilty to the count related to that search and it is not at issue in this appeal.

2

actually enter the house. Id. at 45-46. ABCED Agent Philip Myers observed Wright through the screened door under the covered porch and said that he walked out of the door onto the porch as the officers approached. Id. at 8-9. Myers then arrested Wright on the porch. Id. at 9-10. Myers testified that Wright asked if he could get his shirt and shoes and advised the officers that his girlfriend, Patrice Tolbert, was inside the house. Id. at 10-11. With the knowledge of Tolbert's presence in the house, Myers became concerned about safety for himself and for the other officers because he knew that Wright had previously had weapons in the house, he had been warned to be careful, and he had observed an open window from which a weapon could be fired. Id. at 11-13. Myers agreed to let Wright get his shirt and shoes, escorted him into the kitchen, and asked Tolbert to retrieve the shirt and shoes for him. Id. at 13-14. Tolbert went to the back of the house, escorted by an officer, to the items. Id. at 14-15. Within a minute of waiting in the kitchen, which Myers described as about six- to eight-feet wide by ten- to twelve-feet long, with Wright, Myers noticed the corner of a plastic baggy containing what appeared to be powder cocaine and a straw with powder residue on the top of the refrigerator in plain view. Id. at 14-16. He then noticed a razor with similar residue on the table, and some pink tablets that appeared to be prescription Lortabs, packaged in a clear plastic sandwich bag inside a cabinet door that was "partially

3

opened . . . about six to eight inches." Id. at 16-19. As Myers "further opened the cabinet to retrieve the tablets," he noticed other narcotics and money in the cabinet. Id. at 18. The tablets were confirmed to be Lortab 10 by Alabama Poison Control. Id. at 21.

At the suppression hearing, Busby testified that she noticed the razor blade contained white powder residue when she sat down at the kitchen table to write down information. Id. at 41. After Busby had informed Myers of the residue on the razor blade, she said that he began looking around the kitchen and called her over after he noticed the pills. Id. at 42-43. She said that, once alerted by Myers, she was able to see the pills in the cabinet from where she was standing. Id. at 43-44. After testifying that Myers further opened the cabinet to remove the pills, she admitted that her written report incorrectly stated that she had opened the cabinet. Id. at 44, 47, Exh. 9 at 2. She also admitted that, although she had testified during state court proceedings that she was the first to notice the pills in the cabinet, Myers was actually the first to notice them. Id. at 47, 52. She explained that any confusion was because "[e]verything just happened so fast. It was in quick succession." Id. at 50.

Federal Public Defender investigator Daniel Stankoski also testified. He had visited Wright's house after the arrest to take measurements. Id. at 60. With the

4

cabinet door open about eight inches, Stankoski said there was "limited visibility." Id. at 62-63.

Wright testified that he was on the porch when the law enforcement officers arrived wearing shoes but no shirt. Id. at 74-75, 84-85, 87. The officers arrested him, and put in him handcuffs on the porch. Id. at 75. He said that he did not ask for the shirt or go into the house but that one of the officers went into the house and asked Tolbert bring a shirt to Wright. Id. at 75-76, 85. He also said that the kitchen cabinet doors were shut on the day of his arrest. Id. at 77-79.

The district court denied Wright's motion to suppress, finding that the officers had a legal right to conduct a protective sweep of the house, saw the Lortabs in plain view inside a partially opened kitchen cabinet, and had the right to further open the cabinet to retrieve the pills when they saw the crack cocaine and money. Id. at 98-100.

Wright subsequently pled guilty to Count 2 and, after waiving his right to a jury trial, was found guilty at a bench trial of Counts 1 and 3. The district court also found a sufficient nexus between the charged crimes and the money to support the forfeiture count. Wright was then sentenced to concurrent terms of imprisonment for 121 months on each count, and a concurrent 5-year term of supervised release, and the property was ordered forfeited.

5

On appeal, Wright first argues the officers were not lawfully in his kitchen because, once the officers located Tolbert and determined she was unarmed, the protective search ended, meaning that the officers were not permitted to remain in the kitchen to question her and should have removed her to a police car. Further, although Wright's request for clothing constituted tacit consent to enter the house, once Tolbert returned with his clothes, the officers' justification for remaining in the house evaporated. In addition, Wright never consented to the search of his cabinet. Wright also argues that the protective sweep of the cabinet was not justified because the cabinet was not large enough to hold a person and the officers had no basis to believe that it held a weapon. Therefore, even if the pink tablets were in plain view, the officers needed a warrant before they seized the pills. Wright contends that his substantial rights were violated and that the evidence seized should have been suppressed as fruit of the poisonous tree and not utilized to convict him or support the forfeiture of the money found in the cabinet.[2]

## II. DISCUSSION

___

[2] Wright also correctly argued that the district court's alternative reasoning for the officers remaining in the house, i.e., that Tolbert was under arrest at the time the contraband was found, was clearly erroneous because it was not supported by the officers' testimony. The officers did not testify that Tolbert was under arrest when they were in the kitchen. See Doc. No. 44 at 41.

Wright also initially raised an issue regarding his sentence in his initial brief. He subsequently withdrew that argument and it is not addressed in this opinion.

A ruling on a motion to suppress evidence entails questions of law and fact. United States v. Steed, 548 F.3d 961, 966 (11th Cir. 2008) (per curiam). We accept the district court's factual findings unless they are clearly erroneous, construing all facts in favor of the prevailing party. See id. We review the district court's application of the law to the facts de novo. See id.

A. <u>Whether the officers were lawfully in Wright's kitchen</u>

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590, 100 S. Ct. 1371, 1382 (1980). The warrantless search inside a home is "presumptively unreasonable." Id. at 586, 100 S. Ct. at 1380. There are, however, "a few 'jealously and carefully drawn' exceptions" that include voluntary consent and exigent circumstances. McClish v. Nugent, 483 F.3d 1231, 1240 (11th Cir. 2007) (citation omitted). "Under either consent or exigent circumstances, an officer who conducts a warrantless search or seizure inside the home bears the burden of proving that his conduct was justified." Id. at 1241.

"A consensual search is confined to the terms of its authorization." United States v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990). "A 'protective sweep 'is a quick and limited search of premises, incident to an arrest and conducted to

7

protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094 (1990). It is only justified when there is reasonable suspicion that the area to be swept harbors an individual dangerous to the police. See United States v. Delancy, 502 F.3d 1297, 1307 (11th Cir. 2007). The Supreme Court held that a protective sweep (1) should last "no longer than [] necessary to dispel the reasonable suspicion of danger," (2) "may extend only to . . . those spaces where a person may be found," and (3) must last "no longer than it takes to complete the arrest and depart the premises." Buie, 494 U.S. at 335-36, 110 S. Ct. at 1099.

Upon review of the record and upon consideration of the parties' briefs, we find no reversible error. Wright voluntarily consented to allow officers to enter his house in order for him to retrieve his shirt and shoes thus providing the officers with a legal right to be in the kitchen. The purpose of the protective sweep of Wright's kitchen was to secure it and investigate the officers' reasonable suspicion of danger. They knew that Wright had previously kept weapons in his home and that Tolbert was in the house. The sweep did not last longer than necessary to dispel the reasonable suspicion of danger and obtain Wright's clothing.

B. Whether the incriminating character of the pills was immediately apparent

Wright next argues that the plain view doctrine does not apply because the incriminating character of the pink pills was not immediately apparent. Wright contends that the evidence proved that it was impossible to see the pills when the cabinet door was opened to the eight inches that the officers testified to at the suppression hearing. Further, Wright contends that the officers' testimony that they only saw the pills until the cabinet was opened further was not plausible because if they saw the pills, they also should have been able to see the money in the corner of the cabinet. Additionally, Wright argues that the officers did not have probable cause to believe that the pills were contraband because (1) the officers only suspected that the tablets were Lortab; (2) there was no evidence that the tablets were inherently distinctive; (3) similar looking tablets are in the pharmacy; (4) medicine is kept in kitchen cabinets; and (5) the officers could not verify that the tablets were contraband until they called a poison control center. Thus, the incriminating character of the pills was not immediately apparent.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). We accept the trial court's credibility determination "'unless it is contrary to the laws of nature, or is

9

so inconsistent or improbable on its face that no reasonable factfinder could accept it.'" Id. (citation omitted). Accordingly, in evaluating the factual versions of events between a law enforcement officer and a defendant, we will defer to the district court's determinations "unless [its] understanding of the facts appears to be 'unbelievable.'" Id. (citation omitted).

Within the proper scope of a protective search, an officer is entitled "to seize any evidence . . . discovered in plain view." United States v. Hromada, 49 F.3d 685, 690 (11th Cir. 1995). "The 'plain view' doctrine permits a warrantless seizure where (1) an officer [was] lawfully located in the place from which the seized object could be plainly viewed and [had] a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006). For an item's incriminating character to be "immediately apparent," the police merely need probable cause to believe that the item is contraband. Texas v. Brown, 460 U.S. 730, 741-42, 103 S. Ct. 1535, 1543 (1983). Probable cause, in turn,

> merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief . . . that certain items may be contraband . . .; it does not demand any showing that such a belief be correct or more likely true than false. A practical, nontechnical probability that incriminating evidence is involved is all that is required.

Id. at 742, 103 S. Ct. at 1543 (internal quotation marks and citations omitted).

10

Upon review of the record and upon consideration of the parties' briefs, we find no reversible error. The incriminating character of the pills was immediately apparent and a man of reasonable caution could find that the pink pills were contraband. Myers had experience and training in identifying Lortab, Busby and Myers had already observed apparent narcotics in the kitchen, and the pills were packaged in a clear plastic sandwich bag instead of a prescription drug bottle. Further, the officers' testimony about their ability to see inside the partially opened cabinet was not "unbelievable."

## III.  CONCLUSION

Wright appeals the district court's suppression of evidence found in his kitchen. The officers were, however, lawfully present in the house, observed the Lortab in plain view, and had the authority to seize the Lortab and secure the remaining narcotics and money. The district court did not err in denying Wright's motion to suppress.

**AFFIRMED.**