# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1382

_____

United States of America

*Plaintiff - Appellant*

v.

Dane Charles Arredondo

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of South Dakota - Rapid City

_____

Submitted: December 18, 2020
Filed: May 10, 2021

_____

Before GRUENDER, ERICKSON, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

During the evening hours of January 5, 2019, officers were dispatched to Dane Arredondo's ("Dane") house on a neighbor's report of a woman screaming and crying inside the residence. When the officers arrived, they entered the home without consent to check on the woman. They found her downstairs, extremely intoxicated but apparently unharmed. While inside the house questioning Dane's brother, David

Arredondo ("David"), about the disturbance, the officers discovered small glass medicine vials. Dane was charged with (1) health care fraud, in violation of 18 U.S.C. § 1347; (2) acquiring controlled substances by fraud, in violation of 21 U.S.C. § 843(a)(3); and (3) possession of controlled substances, in violation of 21 U.S.C. § 844. The government appeals the district court's[1] order granting Dane's motion to suppress the vials. We have jurisdiction under 18 U.S.C. § 3731, and we affirm.

## I.    BACKGROUND

On January 5, 2019, at around 10:00 p.m., Pennington County Deputy Eric Fenton arrived at Dane's house to investigate a disturbance that was reported by a concerned neighbor. The neighbor reported hearing slamming doors and screaming and crying from a woman inside the house next door. The neighbor had not heard any gunshots. Deputy Fenton approached the front door and listened to see if he could hear screaming or other noises, but all was silent. As Deputy Fenton stood outside the home, he peered inside and observed a rifle casing on one of the steps leading upstairs in the bi-level home. After he relayed this information to dispatch, he rang the doorbell.

Deputy Fenton's body cam recorded David answering the door by opening it only wide enough to peek out. Deputy Fenton inquired whether everything was okay and received assurances from David that all was well. Deputy Fenton asked whether there had been an argument. David acknowledged that there had been an argument, but said it had been resolved and "she is fine." When Deputy Fenton asked for permission to step inside to check on the situation, David resisted, indicating that the house was his brother's residence. When Deputy Fenton inquired who was in the

---

[1]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota, adopting in part the Report and Recommendation of United States Magistrate Judge Daneta Wollmann.

residence, David noted his girlfriend was there on the floor right now. This piqued Deputy Fenton's concern and he followed up with "on the floor?!" and entered.

David volunteered that his girlfriend was "really drunk right now" and noted that he had not invited or consented to Deputy Fenton's entry. Deputy Fenton informed David that he was there to check on the woman's welfare and asked David to accompany him downstairs. David asked Deputy Fenton to stop touching him, at which point Deputy Fenton, in a raised voice, ordered David to come downstairs or else be handcuffed. They went downstairs.

Once in the basement, David headed toward a back room with an open door. Deputy Fenton directed David to "stay right here, stay right here." Deputy Fenton radioed dispatch and reported (1) he was inside the home with a male, (2) there was a female laying on the floor but he believed she moved into one of the bedrooms downstairs, and (3) the male was "not being that cooperative." Deputy Fenton then opened the nearest bedroom door and observed a woman inside who was later identified as David's girlfriend, Ashley Richards. When Deputy Fenton inquired whether she was injured, Ashley said she was unharmed. Deputy Fenton asked Ashley why she was laying on the floor, and she responded "because I want to." Meanwhile, David again moved towards the back room, causing Deputy Fenton to grab David by a lanyard he was wearing, yank him away from the back room, handcuff him, and pat him down. At this point, Deputy Fenton observed Dane seated on a mattress on the floor in the room with Ashley. As Deputy Fenton attempted to identify David, Dane asked if they could go upstairs. David informed Dane that Deputy Fenton was not listening and that he had not invited the deputy into the home. Dane then repeated his request to go upstairs.

The situation in the basement was confused with Ashley asking Deputy Fenton why he was there, David directing Ashley to explain that she was not hurt or threatened, and Ashley stating repeatedly "he is not a threat to me." When additional

officers arrived and joined the group downstairs, Deputy Fenton directed Officer Matthew Pond to identify Dane while he talked to Ashley.

Deputy Fenton relayed Ashley's name and date of birth to dispatch and then turned his attention back to David, asking "do you want to tell me what happened here?" David explained that Ashley and he were arguing when she ran down the stairs and fell. Dane was sleeping, so David tried to calm Ashley down. David denied touching Ashley or hurting her. Deputy Fenton then re-entered the bedroom and asked one more time whether Ashley had suffered any injuries. Ashley confirmed she was not injured. Determined to satisfy himself that this was true, Deputy Fenton shined a flashlight on Ashley and asked her to pull her hair back. Ashley complied, and Deputy Fenton saw no sign of injury but noted that she looked "highly intoxicated" and like she had been crying. Deputy Fenton recounted during his testimony that he saw no signs Ashley that had been in a physical altercation and thought she was "exhausted and drunk."

After leaving the room where Ashley was laying, Deputy Fenton proceeded to the open area of the basement where David and Dane were located and asked about Dane's identification. Dane indicated his wallet was upstairs. When Dane headed upstairs to get it, Deputy Fenton and Officer Pond followed. Dane's wallet was on the stair ledge. After looking at Dane's driver's license, Officer Pond stated "Richards? You told me a different name?!" A discussion ensued in which Dane and David asserted that Officer Pond had misunderstood and that while Ashley's last name was Richards, Dane's last name was Arredondo. Officer Pond, convinced Dane had lied about his identity, directed him to put on his shoes so they could go to the squad car for further questioning.

While Officer Pond took Dane outside, Deputy Fenton put David on one of the couches upstairs. About four minutes later, Deputy Fenton glanced at a different couch behind him and saw some small clear medicine vials. Picking one up, Deputy

-4-

Fenton asked "what are these?" David responded that Dane is a paramedic so he has a prescription. Deputy Fenton then grabbed another small vial off of the couch and held it up to read the label, identifying it as a Ketamine vial. Deputy Fenton asked David if Dane had a prescription for Ketamine. David indicated Deputy Fenton should look in a black box, which contained Dane's paramedic license. Deputy Fenton, uncertain of the nature of the drugs, researched on his phone if any of the vials contained controlled substances. After determining that at least some of the empty vials previously contained controlled substances, the officers placed the vials in evidence bags. While Deputy Fenton was questioning David, Officer Pond discovered and seized a vial of Fentanyl in the basement.

Dane moved to suppress the vials, arguing they were the fruit of an illegal search. The magistrate judge prepared a report and recommendation, recommending the evidence be suppressed because, by the time Deputy Fenton discovered the vials, the exigent circumstances and community caretaker function that had justified the initial entry had dissipated and Deputy Fenton was unlawfully on the premises. The district court adopted the magistrate judge's report in part and rejected it in part, finding that Deputy Fenton was lawfully present in the living room when he observed the vials because Dane had consented to going upstairs, but that the vials were subject to suppression because their incriminating character was not immediately apparent. The government appeals the suppression of the Ketamine vials, but does not challenge the suppression of the Fentanyl.

## II.    DISCUSSION

The Fourth Amendment protects the right of persons to be free from unreasonable seizures of their papers and effects. U.S. Const. Amend. IV. A warrantless seizure of property is per se unreasonable unless it falls within a well-defined exception to the warrant requirement. Robbins v. City of Des Moines, 984 F.3d 673, 680 (8th Cir. 2021). The government contends exigent circumstances and

-5-

the community caretaker function justified the officers' presence upstairs and a warrantless seizure of the vials was permissible under the plain view exception. We review the district court's factual findings for clear error and its legal conclusions *de novo*. United States v. Smart, 393 F.3d 767, 769 (8th Cir. 2005).

While we have reservations about the government's claim that the officers were lawfully present upstairs, the exigent circumstances and community caretaker function having dissipated and the issue of consent being questionable, it is unnecessary to resolve this issue because the plain view exception does not apply. The plain view exception authorizes an officer to seize an object without a warrant if (1) the officer lawfully arrived at the location from which he or she views the object, (2) the object's "incriminating character" is "immediately apparent," and (3) "the officer has a lawful right of access to the object itself." United States v. Lewis, 864 F.3d 937, 943 (8th Cir. 2017) (citation omitted). Here, even assuming the first and third prongs are satisfied, the second prong is not because the record does not establish the "incriminating character" of the vials was "immediately apparent."

For an item's "incriminating character" to be "immediately apparent," the officer must have probable cause to associate it with criminal activity. Id. at 944. Deputy Fenton possessed no such probable cause. When he came upon small glass containers that looked similar to containers that hold common household items, such as contact lenses, essential oils, or medications for insulin or fertility, there was no basis to immediately suspect contraband. Whether the vials contained contraband was even less immediately apparent here, as they were observed on a dark couch in a poorly lit room in a residence where Deputy Fenton knew one of the occupants was a paramedic. While Deputy Fenton believed that the vials laying on the couch "seem[ed] a little odd," something seeming "a little odd" is usually a hunch and not probable cause. And although the officers witnessed strange behavior from Dane, David, and Ashley, the presence of bottles and cans strewn about the basement floor and upstairs living room gave the officers reason to believe that the three individuals

-6-

inside the house were drunk, which is not itself unlawful. When Deputy Fenton picked up the vials, held them higher to get a better view, and turned them to read the labels, he had no idea of the contents. At that moment, the vials had been searched and seized, before Deputy Fenton had probable cause to believe they were an illegally possessed controlled substance. See Arizona v. Hicks, 480 U.S. 321, 323–26 (1987) (moving components of two stereos in order to read the stereos' serial numbers was a search and the plain view of the stereos without serial numbers did not supply probable cause to believe they were contraband, even though the expensive stereos "seemed out of place in the squalid and otherwise ill-appointed" apartment).

We also note there is nothing in this record suggesting that Deputy Fenton had specialized expertise or training with regard to narcotics such that his specific knowledge could be a basis for finding probable cause. In fact, after picking up and reading a vial, Deputy Fenton did not know whether Ketamine was a controlled substance. He used his phone to conduct research. Similarly, Officer Pond told Deputy Fenton that he would have to look into whether Dane could be charged with possession of a controlled substance since Dane was a paramedic. Deputy Fenton had nothing more than a hunch that the vials could be incriminating, which is not enough for the plain view exception to apply. See United States v. Hogan, 25 F.3d 690, 693 (8th Cir. 1994) (the agents' hunch that the drugs from the house or truck might be in the Oldsmobile is not enough to justify a search under the automobile exception).

## III.   CONCLUSION

For the foregoing reasons, we affirm the district court's grant of Dane's suppression motion.

GRUENDER, Circuit Judge, dissenting.

The court affirms the district court's suppression order, in my view wrongly concluding that the glass vials' incriminating character was not "immediately apparent" under the plain-view doctrine.[2] In so doing, the court erroneously requires virtual certainty of the incriminating character of the glass vials and ignores the totality of the circumstances. I respectfully dissent.

An object's incriminating character is immediately apparent if an officer has probable cause to associate the property with criminal activity. *United States v. Weinbender*, 109 F.3d 1327, 1330 (8th Cir. 1997). As "[t]he Supreme Court [has] noted[,] . . . the phrase 'immediately apparent' is misleading . . . because it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the plain view doctrine." *United States v. Cowan*, 674 F.3d 947, 953 (8th Cir. 2012) (internal quotation marks omitted) (citing *Texas v. Brown*, 460 U.S. 730, 741 (1983) (plurality opinion)). But the immediately apparent standard does not require "that an officer be 'sure' or 'certain.'" *Weinbender*, 109 F.3d at 1330. Indeed, it does not even require that an officer's "belief be . . . more likely true than false." *Cowan*, 674 F.3d at 953. Instead, it requires only "that the facts available to a reasonably cautious man would warrant a belief that certain items may be contraband or stolen property or useful as evidence of a crime." *Weinbender*, 109 F.3d at 1330 (internal quotation marks omitted). In considering whether an officer had such probable cause, we consider the totality of the circumstances. *United States v. Sanders*, 631 F.2d 1309, 1315 (8th Cir. 1980).

[2]To the extent the court expresses doubts about Deputy Fenton being in a lawful position to view the glass vials, *see supra* at 6, I disagree. The district court did not clearly err in finding that a reasonable officer would have believed Dane consented to the officers' presence upstairs, considering that Dane asked Deputy Fenton, "Can we go upstairs?" six times in three minutes and then led the officers upstairs to view his license. *See United States v. Williams*, 346 F.3d 796, 799 (8th Cir. 2003) (explaining that consent may be "reasonably implied from behavior").

Here, several factors gave Deputy Fenton probable cause to associate the glass vials with criminal activity. First, the home's occupants lied to officers. *See Nieves v. Bartlett*, 587 U.S. ---, 139 S. Ct. 1715, 1724 (2019) ("[A] suspect's untruthful and evasive answers to police questioning c[an] support probable cause."); *United States v. Ameling*, 328 F.3d 443, 449 (8th Cir. 2003) (finding probable cause in part because of "apparently false statements"). When David answered the door, he told Deputy Fenton that his brothers were out and that only his girlfriend was in the home. In reality, Dane—David's brother—was in the basement. Further, the evidence indicates that Dane may have given Deputy Pond a false name. *See United States v. Bettis*, 946 F.3d 1024, 1030 (8th Cir. 2020) (finding probable cause in part because defendant gave a false name).[3]

Second, the occupants behaved evasively. *See United States v. Jones*, 535 F.3d 886, 891 (8th Cir. 2008) ("Evasive behavior, while not alone dispositive, is another fact supporting probable cause."). When Deputy Fenton and David first entered the basement, David tried to walk away into a separate, darkened room, prompting Deputy Fenton to tell David to stay put. Nonetheless, as soon as Deputy Fenton's attention was focused elsewhere, David again tried to duck into the separate room, requiring Deputy Fenton to restrain David and place him in handcuffs. Further, when Deputy Fenton asked Dane why there was a rifle casing on the stairs, Dane responded that it was because he was a paramedic. When Deputy Fenton repeated his question, Dane again evaded the inquiry, commenting instead on the caliber of the casing and never answering the question. *See Nieves*, 139 S. Ct. at 1724 ("[A] suspect's untruthful and evasive answers to police questioning c[an] support probable cause.").

Third, the occupants were acting strangely and seemed highly intoxicated. *See, e.g., United States v. Martin*, 869 F.2d 1118, 1121 (8th Cir. 1989) (upholding seizure

---

[3]As the district court noted, "[t]he video does not record defendant giving a last name, but Deputy Pond is recorded calling in the name 'Dane Richards' to dispatch."

of a soft-drink bottle under the plain-view doctrine in part because of intoxicated behavior). Deputy Fenton described David as "highly intoxicated," "slurring his speech," incoherent, and unresponsive to his requests. Further, unprompted and in relation to nothing, David blurted out at least seven times that he was a teacher. Deputy Fenton described Ashley, who was initially found lying on the basement floor, as "look[ing] disheveled," "highly intoxicated," and "completely out of it." Dane too acted strangely. When asked for his date of birth, Dane tried to respond with his last name, which he then could not remember. He asked to go upstairs six times in three minutes despite being repeatedly told no. And Dane giggled when officers indicated they had been concerned Ashley might have been "laying there bleeding on the floor."

The court minimizes the relevance of this behavior, arguing that the occupants' "strange behavior," combined with "the presence of bottles and cans strewn about [the home], gave the officers reason to believe that the three individuals inside the house were drunk," but evidently nothing more. *Supra* at 6-7. But the court's own logic cuts the other way—the presence of empty drug vials "strewn about" a couch, combined with the occupants' intoxicated behavior, gave Deputy Fenton reason to believe the occupants were engaged in illegal drug use. If the empty liquor bottles could suggest drunkenness, why could not the empty glass vials suggest drug intoxication?

Further, the fact that the Deputy Fenton might not have known whether the occupants were intoxicated from alcohol or drugs does not defeat probable cause. Probable cause does not require officers to rule out innocent explanations. *See District of Columbia v. Wesby*, 583 U.S. ---, 138 S. Ct. 577, 592 (2018); *United States v. Perry*, 908 F.3d 1126, 1129 (8th Cir. 2018). Indeed, it does not require that an officer be certain that illegal activity is afoot, or even that illegal activity be more likely than legal activity. *See Cowan*, 674 F.3d at 953. Rather, as we have repeatedly held, it requires only "[a] practical, nontechnical probability that incriminating

evidence is involved." *See, e.g., United States v. Craddock*, 841 F.3d 756, 759 (8th Cir. 2016) (internal quotation marks omitted); *Fagnan v. City of Lino Lakes*, 745 F.3d 318, 323 (8th Cir. 2014); *Cowan*, 674 F.3d at 953; *United States v. Muhammad*, 604 F.3d 1022, 1027-28 (8th Cir. 2010); *Weinbender*, 109 F.3d at 1331; *United States v. Garner*, 907 F.2d 60, 62 (8th Cir. 1990).

Fourth, the glass vials themselves suggested illegal drug possession and/or use. There were six glass vials, of the kind that drugs are stored in, largely empty, strewn about a couch. They were not in a medicine cabinet, or in Dane's paramedic bag, or in any other place one would expect to find lawful medication. *See Cronin v. Peterson*, 982 F.3d 1187, 1197 (8th Cir. 2020) (holding that probable cause is a "practical and common-sensical standard" that allows an officer to draw reasonable inferences). Nor were they in a location where one would expect to find "contact lenses" or "essential oils." *See supra* at 6. The vials' suspicious location contributed to probable cause. *See United States v. McGehee*, 672 F.3d 860, 869 (10th Cir. 2012) (upholding under the plain-view doctrine the seizure of a vanilla-extract bottle lodged in a driver's side door); *United States v. Wright*, 324 F. App'x 800, 804 (11th Cir. 2009) (explaining that pills' incriminating character was immediately apparent in part because they "were packaged in a clear plastic sandwich bag instead of a prescription drug bottle").

For example, in *United States v. Murphy*, while executing a search warrant for illegal firearms, officers came across "glass bottles, beakers, chemicals, and bottled gas in green and orange containers bearing 'flammable' warning labels." 69 F.3d 237, 242 (8th Cir. 1995). The officers believed it to be an explosives lab and called federal authorities, who informed them it was actually a methamphetamine lab. *Id.* We upheld the seizure of the equipment, stating that "[r]egardless of whether the chemicals were used for manufacturing drugs or explosives, their incriminating nature as contraband was immediately apparent to officers entering the house." *Id.* Had the officers found these materials in a laboratory setting, it seems unlikely we would have

concluded that their incriminating character was immediately apparent. But their presence in a residence was bizarre. Similarly, had the glass vials been in a medicine cabinet or a paramedic bag, Deputy Fenton may not have had probable cause to associate them with criminal activity. But they were not.

Further, the fact that the vials were largely empty, combined with the intoxicated behavior of the home's occupants, suggests illegal drug use. *Cf. United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) (noting that an "empty ammunition box raise[d] an inference that the contents had been used").

The court argues that the glass vials themselves could not have been suspicious because they "looked similar to containers that hold common household items, such as contact lenses, essential oils, or [legal] medications." *Supra* at 6. But we have repeatedly held that an object need not be "inherently incriminating" to satisfy the immediately apparent standard. *See, e.g., Muhammad*, 604 F.3d at 1028 ("While cash is not inherently incriminating, under these circumstances, [the officer] had probable cause to believe that the cash protruding from the wallet was evidence of the robbery."); *United States v. Bustos-Torres*, 396 F.3d 935, 945 (8th Cir. 2005) (applying "a dose of common sense" in the plain-feel context and concluding that a large "wad of papers . . . was likely evidence of [a] drug trade"). And, again, probable cause does not require eliminating all possible lawful explanations. *See Wesby*, 138 S. Ct. at 592. Further, the glass vials were not near a diffuser or contact-lens solution or anything else that would support the court's speculation.

Considering the totality of the circumstances, Deputy Fenton had probable cause to believe the glass vials were associated with criminal activity. Indeed, our prior decision in *Martin* very nearly mandates this conclusion. There, an officer pulled over a car for weaving. 869 F.2d at 1119. The driver had bloodshot eyes, slurred speech, and general unsteadiness. *Id.* The passengers were "semi-conscious." *Id.* While the officer was arresting the driver, one of the passengers asked to remove

her belongings from the trunk. *Id.* at 1119-20. When she opened the trunk, the officer noticed two soft-drink bottles. *Id.* at 1120. When asked about their contents, she indicated they contained "Seven-Up and Sprite" and then "appeared deliberately to drop [one bottle] on the pavement." *Id.* The officer seized the bottle, opened it, and discovered that the bottles contained liquid PCP. *Id.* We held that these facts "clearly [fell] under the plain view exception" because "the apparent intoxication of the foursome and [the passenger's] attempt to destroy the bottle gave [the officer] probable cause to suspect the presence of illicit drugs." *Id.* at 1121. Similarly, here, the occupants' intoxicated behavior, their false statements, their evasiveness, and the oddity of the glass vials' character established probable cause.[4]

Finally, the court's fixation on Deputy Fenton's lack of specific narcotics training or expertise simply misses the mark. *See supra* at 9-10. He did not need special training, a specific knowledge of what drugs the glass vials contained, or prior experience with Ketamine to conclude that intoxicated and suspicious behavior combined with empty glass vials suggested illegal drug use. Common sense was enough. *See Craddock*, 841 F.3d at 759 (holding that probable cause requires no more than "a practical, nontechnical probability that incriminating evidence is involved" (internal quotation marks omitted)); *cf. Martin*, 869 F.2d at 1121 (finding probable cause that soft drink bottles contained illicit drugs without any indication that officer had any specialized narcotics training or prior experience).

In sum, considering the totality of the circumstances, Deputy Fenton had probable cause to associate the glass vials with illegal drug possession and/or use. In concluding otherwise, the court requires certainty rather than probability; it views

---

[4]The court points out that, in *Martin*, someone tried to destroy the bottles, whereas here no one tried to destroy the glass vials. *Supra* at 9 n.2. Fair enough. But in *Martin*, we held that intoxicated behavior plus another suspicious factor "clearly" satisfied the plain-view doctrine. *See* 869 F.2d at 1121. Here, intoxicated behavior plus numerous other suspicious factors does the same.

facts individually rather than in their totality; and it conjures implausible possibilities at the expense of common sense.  Accordingly, I respectfully dissent.

_____