# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3599

_____

United States of America

*Plaintiff - Appellee*

v.

Jason Long

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Pierre

_____

Submitted: May 15, 2015
Filed: August 14, 2015

_____

Before RILEY, Chief Judge, BRIGHT and MURPHY, Circuit Judges.

_____

RILEY, Chief Judge.

Jason Long (Long) pled guilty to one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), after the district court[1] denied his motion to suppress evidence obtained by United States

_____

[1]The Honorable Roberto A. Lange, United States District Judge for the District of South Dakota, adopting in part the report and recommendation of the Honorable

Bureau of Indian Affairs (BIA) officers when searching the store once operated by Long. As permitted by his plea agreement, Long appeals this denial, maintaining the officers' searches were unconstitutional. Because we agree with the district court that the officers' actions did not violate the Fourth Amendment, we affirm.[2]

## I.  BACKGROUND

Jason Long, a member of the Lower Brule Sioux Tribe, operated the "OC Store"[3] in Lower Brule, South Dakota, on the Lower Brule Sioux Reservation. The OC Store appears to have been a one-time gas station converted into a convenience and novelty store. The store was housed in a metal building with few exterior windows; all of the windows facing the parking area are covered with metal grates. The store sold soda, coffee, some food, tobacco products, and an eclectic assortment of other merchandise in addition to offering arcade games and movie rentals.

On July 28, 2012, at approximately 4:20 a.m., BIA Officer Shane Spargur encountered three juveniles in Lower Brule who he suspected were violating the tribe's curfew. Officer Spargur noticed the juveniles had fireworks, which were illegal to ignite other than during a three-day period for celebrating Independence Day. Officer Spargur questioned the juveniles about the fireworks, and one "stated that he just bought them down at the OC Store." Officer Spargur then proceeded approximately two blocks to the OC Store "to make contact with" Long about the sale of the fireworks.

When Officer Spargur arrived at the store, he was "unsure" whether it "was open or closed." He did not see an open/closed sign nor any posted business hours.

---

Mark A. Moreno, United States Magistrate Judge for the District of South Dakota.

[2]28 U.S.C. § 1291 provides appellate jurisdiction.

[3]The store is also know as "OC Novelties" and the old "Sioux Boys" store.

An exterior street light in the parking lot and a flood light by the front door were on. Officer Spargur could hear loud music coming from inside. Although the store was not "fully lit," "[i]t was pretty well lit" such that Officer Spargur could see the store's interior and merchandise. At that point, Officer Spargur did not see any customers or employees. Having never been to the store before, Officer Spargur was not sure whether these facts indicated the store was open or closed. Officer Spargur ultimately concluded the store was open because of the lights, music, unlocked doors, and the juveniles' report that they had "just" purchased fireworks there a few minutes before.

Officer Spargur entered the OC Store through two initial doors—both of which were closed but unlocked—leading to a small entryway. He then stopped at a third door, the main door, and "knock[ed] and announce[d] police a couple of times." Although he thought the store was open, Officer Spargur testified he did the knock and announce "because of the time and me working as a police officer not just barging in and going in there . . . just gave the opportunity to someone -- for someone to come to the door to answer it." After receiving no response, Officer Spargur opened the main door, which was also unlocked, and after observing an individual he later learned was Long's son inside, he entered the store.

Officer Spargur then encountered another of Long's sons, Freedom Long, in the store's concession area. Officer Spargur discussed the fireworks with Freedom. Freedom acknowledged the juveniles had been in the store, but he denied the children had bought fireworks. Officer Spargur asked Freedom to retrieve Long, who was sleeping in another room. Based on Freedom's slurred speech and deliberate actions, Officer Spargur believed Freedom was under the influence of some kind of drug. While Freedom was fetching Long, Officer Spargur noticed a small package on one of the concession tables that, based on his experience and training, he "recognized . . . as a package normally holding synthetic marijuana." Once Long emerged from his room, Officer Spargur briefly discussed the fireworks with him, reminded him not to

sell fireworks after Independence Day, apologized for waking him, and then left the store without seizing the suspicious package.

After leaving the store, Officer Spargur began preparing an affidavit to obtain a search warrant. Officer Spargur spoke with the police chief, conducted some internet research to confirm the package he had seen was consistent with synthetic marijuana, and then telephoned tribal judge Lorrie Miner.

Judge Miner was at her home—approximately sixty miles away—when Officer Spargur called to have her "sign the search warrant telephonically." Telephonic warrants are not common in Lower Brule—Judge Miner had only considered two telephonic requests for search warrants during her four-year tenure, and Officer Spargur testified this is the only telephonic warrant he had ever obtained. Neither party recorded the call, so precisely what was said is unknown, but Officer Spargur testified he read Judge Miner the affidavit and "the meat" of his warrant application. Officer Spargur specifically explained he read the things to be searched verbatim, but Officer Spargur did not recall whether he had read the warrant itself to Judge Miner.

At Long's first suppression hearing, Judge Miner had a limited recollection of her conversation with Officer Spargur. Judge Miner testified that during the conversation she would have placed Officer Spargur under oath. Although she recalled being "on the telephone for quite some time" and "Officer Spargur [giving her] a detailed account as to what had occurred," Judge Miner could not remember whether Officer Spargur read the warrant itself. Judge Miner stated she believed she would have had Officer Spargur read the warrant to her "so I know what I am saying yes to." Judge Miner further elaborated she "would have wanted a description of . . . what they were searching for and where they needed to search" and she would have asked questions if the information Officer Spargur provided was not specific enough to support probable cause. At the end of the conversation, Judge Miner approved the

warrant. Judge Miner testified she approved the warrant based solely on the information Office Spargur provided by phone.

After Judge Miner approved the warrant, Officer Spargur assembled a team of officers and searched the OC Store. The officers seized eighty grams of synthetic marijuana in twenty-six packages like that initially seen by Officer Spargur. The officers also searched a 1997 Chevy Blazer located in the OC Store parking lot. The vehicle was registered to Nancy Big Eagle and Freedom Long, and it also contained synthetic marijuana. Officer Spargur placed Long under arrest and interrogated him at the station.

On August 6, 2012, BIA Officer Jason La Mons entered the OC Store with Raelynn Her Many Horses and Joshua Brouse, the owner of the building housing the OC Store, to investigate a reported burglary. Officer La Mons was familiar with the store and had spoken to Vicki Her Many Horses—the prior owner and Long's aunt—"many times" in the preceding week. Vicki had informed Officer La Mons she and Long were having a "family dispute," and "she did not want" Long in her building. Upset about recent break-ins, Vicki told Officer La Mons she wanted the police to investigate. Because of the break-ins, on August 4, 2012, Vicki sold the building to Brouse, the "long term" boyfriend of Vicki's daughter, Raelynn.

Raelynn and Brouse took the officer inside the store and showed him items that had been moved. Once inside, Officer La Mons found a witness statement bearing Long's name, a hundred-dollar bill, and an open shipping box filled with invoices—items that, according to Brouse and Raelynn, had not been in the building before the break-in. La Mons collected these items as evidence of the suspected burglary and then went to Long's house to speak with Long. Long admitted entering the OC Store, so Officer La Mons placed him under arrest. Long was again interrogated at the station.

Long later was charged with three drug offenses. Long filed a motion to suppress the evidence obtained during the July 28 and August 6 searches and the statements he made to the officers while in custody on both dates, claiming violations of the Fourth Amendment and his rights under Miranda v. Arizona, 384 U.S. 436 (1966).[4]

The magistrate judge assigned to the case recommended excluding all evidence obtained from the store on July 28, reasoning Officer Spargur's initial entry into the OC Store was unconstitutional. The magistrate judge recommended admitting the remaining evidence, including the synthetic marijuana found in the Blazer. The district court, adopting the magistrate's recommendation in part, denied Long's motion to suppress in its entirety.

Long conditionally pled guilty to one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Long to time served plus three years of supervised release. Long's guilty plea preserved his right to appeal the denial of his motion to suppress, which Long now does.

## II.    DISCUSSION

"In an appeal from a district court's denial of a motion to suppress evidence, this court reviews factual findings for clear error, and questions of constitutional law *de novo*." United States v. Douglas, 744 F.3d 1065, 1068 (8th Cir. 2014) (quoting United States v. Hollins, 685 F.3d 703, 705 (8th Cir. 2012)). Long contends this court should review the district court's factual findings de novo because the district court partially rejected the magistrate judge's recommendation, and because the

---

[4]On appeal, Long has abandoned his Miranda arguments and now claims only that his statements must be excluded because they resulted from unconstitutional searches.

district court did not conduct its own hearing or view any live testimony. Long cites no legal authority supporting this contention, and our well-established precedent calls for clear error review. See, e.g., United States v. Maxwell, 778 F.3d 719, 731-33 (8th Cir. 2015) (reviewing the trial court's factual findings regarding a motion to suppress for clear error when the trial court declined to adopt the magistrate judge's report and recommendation), petition for cert. filed (U.S. July 8, 2015) (No. 15-5137); United States v. Hatcher, 275 F.3d 689, 690-92 (8th Cir. 2001) (per curiam) (same).

## A.    July 28 Search
### 1.    Initial Entry

Long claims Officer Spargur violated the Fourth Amendment by entering the OC Store without a warrant. The Fourth Amendment protects individuals "against unreasonable searches and seizures" conducted by government officials, U.S. Const. amend. IV, and under certain circumstances, we exclude evidence obtained in violation of its strictures, see United States v. Davis, 760 F.3d 901, 903 (8th Cir. 2014). The critical issue here is "whether [Long] ha[d] 'a constitutionally protected reasonable expectation of privacy'" in the OC Store sufficient to trigger the Fourth Amendment's protections. Oliver v. United States, 466 U.S. 170, 177 (1984) (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). Long "'has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept.' Whether [Long] had a subjective expectation of privacy is a question of fact," which this court reviews for clear error. United States v. Perry, 548 F.3d 688, 691 (8th Cir. 2008) (quoting United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999)).

Long enjoyed some expectation of privacy in the OC Store on July 28. See New York v. Burger, 482 U.S. 691, 699 (1987) ("The Court long has recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes."); Dow Chem. Co.

v. United States, 476 U.S. 227, 235 (1986) ("Plainly a business establishment or an industrial or commercial facility enjoys certain protections under the Fourth Amendment.").[5]  Even so, "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home," Burger, 482 U.S. at 700, and a business owner or operator does not have a reasonable expectation of privacy in the portions of a business open to the public, at least during normal business hours.  See Maryland v. Macon, 472 U.S. 463, 469 (1985) ("[R]espondent did not have any reasonable expectation of privacy in areas of the store where the public was invited to enter and to transact business. . . .  The officer's action in entering the bookstore and examining the wares that were intentionally exposed to all who frequent the place of business did not infringe a legitimate expectation of privacy.").  When a commercial property is *not* open to the public, a reasonable expectation of privacy may exist.  See United States v. Swart, 679 F.2d 698, 701 (7th Cir. 1982) ("[T]he officers knew the business was closed.  Commercial establishments do not extend an implicit invitation to enter during non-business hours or when there are no employees on the premises."); cf. See v. City of Seattle, 387 U.S. 541, 545 (1967) (holding the state cannot punish a business owner for refusing to authorize a warrantless administrative search of his commercial premises "not open to the public").

---

[5]Long maintains he clearly manifested a reasonable expectation of privacy in the OC Store because he also used part of the store as a dwelling.  Although Long was sleeping in a back room when Officer Spargur arrived and kept a number of personal items in the back room, the district court found the OC Store was not Long's residence.  That finding was not clearly erroneous, especially as to the front of the store and concession area Officer Spargur entered—clearly a public sales area.  See, e.g., United States v. Cannon, 703 F.3d 407, 413-14 (8th Cir. 2013) (distinguishing between the portions of a car dealership "open for business" and the locked back rooms used as an employee's residence).  Indeed, the testimony shows Long had a separate residence where Officer La Mons found and questioned him on August 6.

Here, the parties dispute whether the store was open or closed when Officer Spargur entered, and the facts plausibly could support either conclusion. The music, lights, unlocked doors, type of convenience store, and the fact that one of the juveniles claimed to have "just" bought fireworks at the store all suggested the OC Store was open. The dim lights, the initial lack of visible employees or customers, and the time of night suggested the store was closed.[6]

Ultimately, the burden to show a reasonable expectation of privacy is on Long. See Perry, 548 F.3d at 691. Yet Long presented no evidence of the store's operating hours, how the store typically looked when closed, or even that the store was in fact closed when Officer Spargur entered.

After reviewing the testimony, and noting the closeness of the question, the district court concluded "Long . . . failed to establish by a preponderance of the evidence that the OC Store was closed and thus that Long had a reasonable expectation of privacy in the OC Store at the time of the entry." "Absent a showing of clear error it is not our role to second guess the district court's factual determinations." Lowder v. United States, 831 F.2d 785, 787 (8th Cir. 1987). Under the circumstances existing at the time Officer Spargur entered the store, we cannot say the district court clearly erred in determining Long failed to prove the store was closed. See United States v. Almeida-Perez, 549 F.3d 1162, 1173 (8th Cir. 2008) ("[W]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous."). The district court thus did not err in concluding Long had no reasonable expectation of privacy in the public areas of the

---

[6]Officer Spargur was not certain whether the store was open or closed, knocking and announcing his presence twice. The Fourth Amendment requires reasonableness, not certainty.

OC Store where the evidence was left in plain view because the store was open to the public when Officer Spargur entered.  See Macon, 472 U.S. at 469.

## 2. Post-Warrant Search of the Store

Long challenges Officer Spargur's subsequent search of the OC Store claiming the telephonic warrant did not conform with tribal and federal law because, among other things, the warrant itself was never read to Judge Miner and the telephone conversation was not recorded.  The district court refused to suppress evidence obtained during the post-warrant search of the store however, concluding the good-faith exception articulated in United States v. Leon, 468 U.S. 897 (1984), protected Officer Spargur's actions.  We review the application of the good-faith exception de novo.  See United States v. Jackson, 784 F.3d 1227, 1231 (8th Cir. 2015).  Assuming, without deciding, the warrant was deficient, we agree with the district court that the Leon good-faith exception applies.

Under the good-faith exception, evidence is not excluded "'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope,' even if the warrant is subsequently invalidated."  Cannon, 703 F.3d at 412 (quoting Leon, 468 U.S. at 920).

> We have recognized four circumstances that preclude a finding of good faith: "(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid."

Id. (quoting United States v. Fiorito, 640 F.3d 338, 345 (8th Cir. 2011)). In evaluating a search under Leon, we "must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." Jackson, 784 F.3d at 1231.

Long first claims Judge Miner's personal biases led her to "wholly abandon[] her judicial role." In addition to being a tribal judge, Judge Miner was also a member of a tribal judicial committee involved in promoting legislation that criminalized synthetic marijuana on the reservation. Judge Miner also routinely included as a condition of release for arrestees released on bond, "Defendant shall not enter OC Novelties or any other business where synthetic marijuana or synthetic stimulants are sold, offered for sale or possessed." Long thus claims Judge Miner was not a neutral magistrate because she had "actively lobbied" for the passage of the resolution outlawing synthetic marijuana and had already made "the determination that the OC Store was selling synthetic drugs."

We have explained that a judge abandons her judicial role when she "does not serve as a neutral and detached actor, but rather as a 'rubber stamp for the police' and 'an adjunct law enforcement officer.'" United States v. Carpenter, 341 F.3d 666, 670 (8th Cir. 2003) (quoting Leon, 468 U.S. at 914). Judge Miner testified at length about her role on the judicial committee and her prior knowledge of Long and the OC Store. Based on this testimony, the district court concluded Judge Miner was not a strident proponent of synthetic marijuana prosecution, nor was she biased against Long. The district court also credited Judge Miner's testimony, finding "she issued the warrant solely on the information contained in the affidavit and not on a preconceived notion of Long's guilt," and we will not disturb that credibility finding. See United States v. Robbins, 682 F.3d 1111, 1115 (8th Cir. 2012) (explaining "'credibility findings are

-11-

well-nigh unreviewable'" on appeal (quoting United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001))).

We further agree with the district court that Judge Miner's knowledge of and involvement in the small tribal community is not the type of conduct that constitutes abandoning her role as a neutral and detached magistrate. See United States v. Heffington, 952 F.2d 275, 279 (9th Cir. 1991) (refusing "to disqualify small-town judges on demand" merely because "judges and police officers in rural counties often know more about the local criminal recidivists [than do] their more urban colleagues"); see also, e.g., United States v. Scroggins, 361 F.3d 1075, 1084 (8th Cir. 2004) (declaring a judge abandons her neutral role when she is so involved in the issuance of a search warrant she "essentially becom[es] a police officer in a robe").

Long also asserts Judge Miner "wholly abandoned her judicial role" by failing to have Officer Spargur read her the full text of the search warrant. Assuming the warrant was not read, this failure does not suggest Judge Miner "acted as a rubber stamp" for law enforcement. United States v. Decker, 956 F.2d 773, 777 (8th Cir. 1992) (affirming the lower court's conclusion that a judge abandoned his judicial role because the judge did not read the warrant and "failed to note both that the prosecutor had not signed the warrant and that the warrant did not list the property to be seized" (footnote omitted)). Here, Officer Spargur read Judge Miner the application and affidavit—portions of which are reproduced in the warrant itself—and Judge Miner testified she would have questioned Officer Spargur if the information he provided was not sufficient. Long does not dispute that Judge Miner was given enough information to establish probable cause to search, nor does he contend Judge Miner or Officer Spargur acted in bad faith. Under these circumstances, any failure to have Officer Spargur read the full text of the warrant was not a departure from Judge Miner's neutral judicial role. See Leon, 468 U.S. at 916 ("[T]he exclusionary rule is

-12-

designed to deter police misconduct rather than to punish the errors of judges and magistrates.").

Finally, Long asserts Leon's good-faith exception does not apply because the procedure used to obtain the warrant was so deficient no reasonable officer would have relied on the warrant. Officer Spargur read Judge Miner the application and "the meat" of the affidavit verbatim, giving Judge Miner enough information to establish probable cause to search, and at the end of the long conversation Judge Miner approved the warrant. Officer Spargur was reasonable in believing the warrant was valid. See United States v. Stonerook, 134 F. App'x 982, 983-84 (8th Cir. 2005) (unpublished per curiam) (affirming the denial of a motion to suppress evidence obtained through a telephonic warrant and rejecting the defendant's claim "that no reasonable police officer could have relied in good faith on the validity of [a] search warrant" issued in violation of state "law regarding telephonic search warrants"); United States v. Hessman, 369 F.3d 1016, 1018, 1022-23 (8th Cir. 2004) (applying the good-faith exception to a technically deficient warrant obtained by fax); United States v. Richardson, 943 F.2d 547, 548, 550-51 (5th Cir. 1991) (refusing to suppress evidence obtained pursuant to a telephonic warrant that had not met all requirements).

### 3.    Post-Warrant Search of Blazer

Long also challenges the officers' search of the Blazer parked in the OC Store's public parking lot. "Fourth Amendment rights are personal rights that may not be asserted vicariously." United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004). "To mount a successful motion to suppress, an accused must first establish that he personally has a legitimate expectation of privacy in the object that was searched." United States v. Stringer, 739 F.3d 391, 396 (8th Cir. 2014). Long admits he did not own the Blazer, and Long has provided no evidence suggesting he had any constitutionally protected connection to the vehicle or its contents. See, e.g., United States v. Marquez, 605 F.3d 604, 609 (8th Cir. 2010) (deciding a defendant who

"neither owned nor drove the [searched vehicle] and was only an occasional passenger therein" could not challenge the search of the vehicle). Long thus has shown no reasonable expectation of privacy in the Blazer and cannot now contest the search of the vehicle. See id.

But Long proposes the officers violated his reasonable expectation of privacy in searching the Blazer because the vehicle was parked in what he describes as his business's curtilage. We are not convinced. Cf. United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984) (concluding defendant had no reasonable expectation of privacy in the "open back parking lot" of his business).

Long cites no authority for the proposition that a business owner has a reasonable expectation of privacy in all the vehicles parked in his store's public parking lot. Thus, Long had no reasonable expectation of privacy in the Blazer and cannot challenge its search.

### B.    August 6 Search

Long further claims the August 6 search of the OC Store and the seizure of Long's property found there violated the Fourth Amendment. Although Officer La Mons searched the store without a warrant, the district court concluded this search was constitutional because Brouse, the property's owner, consented to the search. "Consent to search, a valid exception to the [Fourth Amendment's] warrant requirement, may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the item to be searched." United States v. James, 353 F.3d 606, 613 (8th Cir. 2003) (internal citation omitted). "'Valid third party consent can arise either through the third party's actual authority or the third party's apparent authority.'" United States v. Chavez Loya, 528 F.3d 546, 554 (8th Cir. 2008) (quoting United States v. Andrus, 483 F.3d 711, 716, modified, 499

F.3d 1162 (10th Cir. 2007)). "[W]hether [Brouse] had actual authority to consent is a question of fact." James, 353 F.3d at 613. The district court concluded because "Long apparently was no longer a tenant" when Brouse purchased the building on August 4, "Brouse as owner of the building had . . . actual . . . authority to permit Officer La Mons's entry and search." Cf. Fernandez v. California, 571 U.S. ___, ___, 134 S. Ct. 1126, 1132 (2014) ("It would be unreasonable—indeed, absurd—to require police officers to obtain a warrant when the sole owner or occupant of a house or apartment voluntarily consents to a search."). The district court's finding of actual authority to consent was not clearly erroneous. See Douglas, 744 F.3d at 1068.

Long counters with a line of cases explaining officers cannot search a leased premises with only the consent of the landlord, not that of the tenant. See, e.g., Chapman v. United States, 365 U.S. 610, 617 (1961). But that line of cases does not help Long because, as noted by the district court, Long presented no evidence he had a lease or was otherwise entitled to occupy or use the premises on August 6.

Long further contends even if the initial entry on August 6 was constitutional, the search and seizure of the shipping box violated the Fourth Amendment because "Officer La Mons had specific knowledge that the personal property being searched was inventory that belonged to Long." Although Officer La Mons knew the box belonged to Long, Brouse and Raelynn told Officer La Mons the box was not in the store before the break-in, making the box possible evidence of the suspected burglary. Officer La Mons reasonably seized the box as evidence of a suspected burglary.[7]

---

[7]Long also seeks to have post-Miranda statements he made to the police suppressed because they were the product of what he considers to be illegal searches. Because we find the July 28 and August 6 searches constitutionally permissible, Long's subsequent statements "need not be suppressed as fruit of the poisonous tree." United States v. Webster, 625 F.3d 439, 446 (8th Cir. 2010).

-15-

## III.  CONCLUSION

We affirm.

BRIGHT, Circuit Judge, concurring in part, dissenting in part.

I concur with respect to the majority's holding regarding the search of the 1997 Chevrolet Blazer and the August 6, 2012 search of the OC Store.  But I dissent with respect to the majority's conclusion that the initial entry of the OC Store on July 28, 2012 did not violate the Fourth Amendment.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The Fourth Amendment "fundamentally protects a person from unreasonable searches." United States v. McMullin, 576 F.3d 810, 814 (8th Cir. 2009).

"To establish a Fourth Amendment violation, a defendant must show that he had a reasonable expectation of privacy in the area searched." United States v. Marquez, 605 F.3d 604, 609 (8th Cir. 2010).  Long bears the burden of establishing "both a subjective expectation of privacy and that the expectation is objectively reasonable." United States v. Perry, 548 F.3d 688, 691 (8th Cir. 2008) (quoting United States v. McCaster, 193 F.2d 930, 933 (8th Cir. 1999)) (internal quotation marks omitted).  The burden placed upon Long is, at most, preponderance of the

-16-

evidence. United States v. Matlock, 415 U.S. 164, 177-78 n.14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). "Preponderance of the evidence means the greater weight of evidence." Smith v. United States, 726 F.2d 428, 430 (8th Cir. 1984) (internal quotation marks omitted). To meet this standard, Long was required to show that "when weighed with [the evidence] opposed to it, [evidence in favor of Long's expectation of privacy had] convincing force and [was] more probably true and accurate." Id.

The facts presented at the suppression hearing plainly meet the preponderance of the evidence standard[8] showing that it was "more probably true and accurate" that the OC Store was closed and, therefore, Long had a subjective[9] expectation of

---

[8]The majority points out that Long "presented no evidence" at the suppression hearing. But a party does not fail to meet the preponderance of the evidence standard simply because he or she does not provide the best evidence on an issue. See, e.g., United States v. Diaz, 685 F.2d 252, 255 (8th Cir. 1982) (holding the government's showing of consent was not fatally flawed by its failure to call an informant as a witness because a police officer testified regarding consent); United States v. Soto, 988 F.2d 1548, 1553 (10th Cir. 1993) (holding the record at the suppression hearing was sufficient to confer standing to challenge a search even though the defendant did not testify regarding ownership of the vehicle); United States v. Hageman, No. 2:11-CR-208-TC, 2011 WL 4403965, at *7 (D. Utah Sept. 21, 2011) ("[T]he fact that the two Defendants did not testify is not necessarily dispositive of the issue" of whether Defendants met their burden to establish standing to challenge a search).

[9]If Long satisfies the subjective expectation of privacy standard by showing the OC Store was closed, Long meets the objective standard because, as the Supreme Court has held, "portions of commercial premises which are not open to the public may only be compelled . . . within the framework of a warrant procedure." See v. City of Seattle, 387 U.S. 541, 545, 87 S. Ct. 1737, 18 L. Ed. 2d 943 (1967).

-17-

privacy. In particular, the record shows: Officer Spargur arrived at the OC Store at approximately 4:30 a.m.; the only exterior illuminated lights around the building were a street light and a flood light for a security camera; there was an electric "Open" sign in another part of the building which was not illuminated; Officer Spargur testified that as he pulled into the parking lot there was no indication the "business [was] open to the public"; all of the doors were closed, but unlocked; "most of the lights [inside the OC Store] were off"; Officer Spargur did not see customers or employees inside the OC Store; and, because he was unsure of whether the OC Store was open, Officer Spargur knocked to announce his presence and received no answer. In light of these established facts, the conclusion follows that by a clear preponderance of the evidence the OC Store was closed. Thus, the district court clearly erred in finding Long failed to meet the preponderance of the evidence standard.

The government asserts that, even if Long had a reasonable expectation of privacy in the OC Store, the Leon good-faith exception applies. The ultimate question under Leon is whether an officer "had an objectively reasonable basis to believe [s/he was] complying with [applicable law] and the Fourth Amendment." United States v. Moore, 956 F.2d 843, 848 (8th Cir. 1992). If an officer's pre-warrant conduct is "clearly illegal," the Leon good-faith exception does not apply. United States v. O'Neal, 17 F.3d 239, 242-43 n.6 (8th Cir. 1994).

Like the magistrate judge in this case, I am "hard pressed to think of a situation where society would be more likely to recognize [—and a police officer would more easily see—] a business owner's expectation of privacy." (Appellant's Addendum 15). As admitted by Officer Spargur, when he approached the OC Store nothing externally indicated the business was open to the public. Officer Spargur also admitted that he continued to investigate—in spite of the OC Store externally appearing closed—and, because he was unsure whether the business was open, felt

obligated to knock and announce. Officer Spargur's account of the initial search and his actions in response to the appearance of the OC Store are not consistent with a good faith belief that the OC Store was open to the public. Thus, under these facts, as well as others highlighted above, Officer Spargur could not in good faith believe that entry into the OC Store was permissible. See, e.g., United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997) (holding the Leon good-faith exception did not salvage a warrantless entry by police because, under the facts known to police at the time of the entry, "[n]o officer could in good faith believe . . . that the defendants consented to the officers' visual or physical access to the motel room" (alteration in original) (internal quotation marks omitted)).

Further, Officer Spargur's conduct was "clearly illegal" because Long possessed an expectation of privacy in his business when it was closed to the public. See v. City of Seattle, 387 U.S. 541, 545, 87 S. Ct. 1737, 18 L. Ed. 2d 943 (1967) ("[P]ortions of commercial premises which are not open to the public may only be compelled . . . within the framework of a warrant procedure."); O'Neal, 17 F.3d at 242-43 n.6 (holding that if pre-warrant conduct is "clearly illegal" the good-faith exception does not apply and "evidence obtained under the resulting warrant should be excluded"). To permit the application of the Leon good-faith exception in this instance would undermine a purpose of the exclusionary rule—"to deter police misconduct." O'Neal, 17 F.3d at 243 n.6 (quoting United States v. Leon, 468 U.S. 897, 916, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984)) (internal quotation marks omitted).

Thus, because the unwarranted search of the OC Store violated the Fourth Amendment and is not salvaged by the Leon good-faith exception, I dissent and would rule that the district court erred when it failed to suppress all evidence obtained

as a result of the July 28, 2012 initial entry—including all evidence collected under the July 28, 2012 search warrant.

_____