# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3308

_____

United States of America

*Plaintiff - Appellee*

v.

Joseph B. Lewis

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 9, 2017
Filed: July 27, 2017

_____

Before SMITH,[1] GRUENDER and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Two detectives entered a work area of Freaks Tattoo Shop without a warrant to talk to Joseph B. Lewis about a person of interest. They saw a gun on a shelf and seized it. Lewis then volunteered that he was a felon. He was charged with being a

_____

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

felon in possession of a firearm. Lewis moved to suppress the discovery and seizure of the firearm. The district court denied the motion. Having jurisdiction under 28 U.S.C. § 1291, this court affirms in part, reverses in part, and remands.

I.

On July 7, 2015, Detective Loran Freeman of the Independence Police Department went undercover to Freaks Tattoo Shop in Independence, Missouri. He was looking for a person of interest in an unrelated case. When he entered the shop, Lewis, an employee there, was sitting at a reception desk in a common area inside the front door. Detective Freeman spent five to ten minutes looking at tattoo art. Not seeing the person of interest, he left.

Ten or fifteen minutes later, Detective Freeman returned to Freaks Tattoo with Detective Aaron Gietzen. They dressed in plain clothes, displaying their neck chains and badges. They did not have a warrant. No one was at the reception desk, but one customer was sitting in the common area. The detectives rang a bell on the desk, trying to get someone to answer. No one answered. The customer told the detectives he was waiting while Lewis drew him a tattoo in the back of the shop.

Behind the reception desk was an open doorway to a work area with individual stations for tattooing customers. There were no signs telling people to stay out of the work area, but a Freaks Tattoo employee testified that the reception desk was meant to be a visual barrier keeping people from walking into the work area uninvited. Detective Freeman knocked on the doorframe for two to three minutes, identifying himself and Detective Gietzen and asking if anyone was there.

Hearing no answer, Detective Gietzen entered the work area and knocked on a closed door to a back room. Lewis answered and joined both detectives in the work area. The detectives identified themselves and told Lewis they wanted to talk about

-2-

the person of interest. Detective Freeman asked if it was okay to talk there. Lewis said yes.

Detective Freeman asked Lewis if the person of interest worked at Freaks Tattoo. Detective Gietzen then noticed a handgun in a nylon holster on a shelf on the side of the room. He grabbed the handgun, removed it from the holster, and checked to see if it was loaded. Lewis then told the detectives he was a felon and did not need any hassles. The detectives did not know Lewis was a felon until he told them. Detective Freeman told Lewis they would keep the handgun. The detectives left with the handgun.

Detective Freeman and another officer returned to Freaks Tattoo the next day to talk to Lewis about the firearm. They asked him if there was somewhere private they could speak. Lewis led them through the work area, through a door, to the back room. Lewis told them he got the gun from a customer a year or two earlier.

The Government charged Lewis with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Lewis moved to suppress the evidence obtained by search of the shop and the seizure of the handgun. After a hearing, a magistrate judge recommended denying the motion. The district court adopted the magistrate judge's findings of fact and conclusions of law, denying the motion to suppress. Lewis pled guilty, reserving the right to appeal the denial of the motion to suppress. Lewis appeals.

## II.

"On review of a motion to suppress, this court reviews factual findings for clear error and legal conclusions *de novo*. This court affirms the denial unless it is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." ***United***

***States v. Ortega-Montalvo***, 850 F.3d 429, 433 (8th Cir. 2017) (citations omitted) (internal quotation marks omitted).

Lewis argues the officers violated his Fourth Amendment rights by searching the work area and seizing the handgun without a warrant. The Government responds that the work area was not "searched" because Lewis had no reasonable expectation of privacy, and the seizure of the handgun was permitted by the plain-view doctrine and to protect officer safety.

A.

To assert a Fourth Amendment right to be free from unreasonable searches, Lewis "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." ***United States v. Russell***, 847 F.3d 616, 618 (8th Cir. 2017).[2] The district court did not address whether Lewis had a subjective expectation of privacy. Assuming he had a subjective expectation, this court examines whether it was reasonable. Whether an individual's expectation of privacy is reasonable is a question of law. ***United States v. DE L'Isle***, 825 F.3d 426, 432 n.4 (8th Cir. 2016).

An individual can have a reasonable expectation of privacy in commercial premises, although that expectation "is different from, and indeed less than, a similar expectation in an individual's home." ***New York v. Burger***, 482 U.S. 691, 700 (1987). "A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant." ***Maryland v. Macon***, 472 U.S. 463, 470 (1985),

_____

[2]Lewis could also assert that right by showing "the Government obtain[ed] information by physically intruding on a constitutionally protected area." ***United States v. Jones***, 132 S. Ct. 945, 950 n.3 (2012). He has not made that argument here.

*quoting **Lewis v. United States***, 385 U.S. 206, 211 (1966). An employee has no reasonable expectation of privacy against ordinary use of "areas of [a] store where the public [is] invited to enter and to transact business." ***Id.*** at 469-70. *See **United States v. Perry***, 548 F.3d 688, 691 (8th Cir. 2008) ("[S]omeone present in a commercial establishment in an area open to the general public has no objectively reasonable expectation of privacy therein."). *See also **Katz v. United States***, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). *Cf. **United States v. Long***, 797 F.3d 558, 565 (8th Cir. 2015) ("When a commercial property is *not* open to the public, a reasonable expectation of privacy may exist."); ***id.*** ("Commercial establishments do not extend an implicit invitation to enter during non-business hours or when there are no employees on the premises." (quoting ***United States v. Swart***, 679 F.2d 698, 701 (7th Cir.1982))).

Lewis shows that, by Freaks Tattoo policy, the work area was not open to the general public—customers were welcome into the work area only if invited by a Freaks Tattoo employee. But that fact, standing alone, does not resolve whether Lewis had an objectively reasonable expectation of privacy in the work area. Even if the general public is not invited onto commercial premises, an individual's expectation of privacy is not reasonable if he or she would reasonably expect the general public to enter the premises anyway. *See **Long***, 797 F.3d at 565-66 (suggesting convenience store employee had no reasonable expectation of privacy in closed store if store looked open); ***Perry***, 548 F.3d at 692 (holding individual can have no reasonable expectation of privacy at "members-only" club if club did not enforce "members-only" policy).

The district court found Lewis had no reasonable expectation of privacy in the work area "[b]ased on the lack of affirmative steps in place to exclude the public"—there was no door, no "signage or other indication that customers could not enter the work area." Lewis contests this finding, arguing that the shop's

-5-

setup—entrance into a waiting room, with a reception desk with call bell placed in front of the doorway to the work area—indicates the public may not enter the work area. Lewis is partly right. The position of the reception desk and the existence of the call bell tell the public they may not walk directly into the work area. The officers here, however, did not walk directly into the work area. They followed the protocol that a reasonable member of the general public seeking to do business with Freaks Tattoo would follow. *See Macon*, 472 U.S. at 470 ("An undercover officer does not violate the Fourth Amendment merely by accepting an offer to do business that is freely made to the public."). *Cf. Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979) ("[T]here is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees."). They rang the call bell, but got no response. A waiting customer told them Lewis was in the back drawing a tattoo. Wanting to talk to Lewis, they knocked on the doorframe to the work area and called out for two to three minutes. Again getting no response, they entered the work area to knock on the door to the back room where Lewis was working.

Like reasonable members of the general public wishing to do business at Freaks Tattoo, the officers first tried to get an employee's attention by ringing the bell and knocking. When that failed, they escalated their attempts, passing through the work area to knock on the back-room door in order to speak to an employee. On these facts, a reasonable employee would expect members of the general public to enter the work area like the officers did here: Other than the reception desk and call bell, there were no indications that the work area was off limits to the public. The reception desk was unattended. People could see straight into the work area as soon as they entered the shop. There was no door that could separate the work area from the waiting area. The work area was used to tattoo customers, not for private work. The work area was not being used. There is no general societal understanding that tattooing rooms are private when not in use; Missouri regulations do not require tattooing rooms be private when not in use. *See* **20 CSR 2267-3.010(2)(F)** ("A panel

or other barrier of sufficient height and width to effectively separate a patron on whom a procedure is being performed from observers or waiting patrons shall be in place or readily available at the patron's request."). As a result, reasonable members of the general public would believe they could pass through the work area to speak to an employee. The officers entered the work area on the same terms as members of the general public. A reasonable employee would expect entrances like the officers'.

True, an employee can have a reasonable expectation of privacy in his or her workplace even if coworkers and customers sometimes enter it. For example, an individual has a reasonable expectation of privacy in an office shared with several others and visited by business guests because he or she can "reasonably . . . expect[] that only those persons and their personal or business guests [will] enter the office." *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968). *See also **O'Connor v. Ortega***, 480 U.S. 709, 716-17 (1987) (4-1-4 decision) (plurality opinion) (quoting *Mancusi*, 392 U.S. at 369); *id.* at 730 (Scalia, J., concurring) (same). *Cf. id.* at 737 (Blackmun, J., dissenting) (contesting "the plurality's suggestion . . . that routine entries by visitors might completely remove" an employee's reasonable expectation of privacy in the workplace). Lewis, however, could not reasonably expect that only his coworkers and their guests would enter the work area. Because of Freaks Tattoo's setup, Lewis could reasonably expect that members of the public would enter the work area like the officers did here.

Lewis has not shown he had a reasonable expectation of privacy in the work area. He warns that this holding will permit police to enter "work areas" of numerous businesses, including law offices, doctors' offices, dentists' offices, hair salons, and hotels. But this no-reasonable-expectation finding is based on the specific facts indicating Lewis would reasonably expect the general public to enter the Freaks Tattoo work area on certain terms—facts not necessarily shared by the other "work areas" he identifies. The officers' entrance into the work area did not violate Lewis's Fourth Amendment rights.

-7-

B.

The Government agrees the officers seized the handgun, but argues the plain-view doctrine and officer-safety concerns justified the warrantless seizure. It does not oppose suppression on any other basis.

A warrantless seizure "is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971); *United States v. Harris*, 747 F.3d 1013, 1016 (8th Cir. 2014). The Government argues that the seizure falls within the plain-view exception, which requires it to show "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Vinson*, 805 F.3d 1150, 1152 (8th Cir. 2015). *See generally Horton v. California*, 496 U.S. 128, 133-37 (1990). Because this court finds the officers did not violate Lewis's Fourth Amendment rights by entering the work area, the only issue is whether the handgun's incriminating character was immediately apparent.

The Government's plain-view argument falters because when Detective Gietzen grabbed the handgun off the shelf, its incriminating character was not immediately apparent. "[A]n item's incriminatory nature is immediately apparent if the officer at that moment had 'probable cause to associate the property with criminal activity' . . . ." *United States v. Craddock*, 841 F.3d 756, 759 (8th Cir. 2016), *quoting Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (plurality opinion) (adopted by *Arizona v. Hicks*, 480 U.S. 321, 326 (1987) ("We now hold that probable cause is required.")). At the moment Detective Gietzen seized the handgun, he did not have probable cause to associate it with criminal activity. True, Lewis does not dispute the district court's finding that the incriminating nature of the gun was immediately apparent *when he admitted to being a felon.* But that admission came *after* the

-8-

seizure—not "at that moment" it was seized. The initial seizure of the handgun does not fall within the plain-view exception.

The Government argues, in the alternative, that the detectives' concerns for their own safety justified the initial seizure of the handgun. The district court found "Detective Gietzen was permitted to retrieve the gun for officer safety when he saw it on the shelf," given that he "did not know if the gun was loaded and, in addition to the detectives and [Lewis], there was a customer in the waiting area." The district court cited two cases to support its conclusion. In the first, this court addressed the "temporary seizure, for limited safety purposes, of a loaded and cocked handgun discovered in the course of executing a search warrant." *United States v. Malachesen*, 597 F.2d 1232, 1234 (8th Cir. 1979). This court held the gun's "temporary seizure, unloading, and retention by a responsible officer (here the inventory officer) seems a reasonable precaution to assure the safety of all persons on the premises during the search." *Id.* In the second, police were executing a search warrant based upon probable cause that an individual was selling marijuana from his apartment. *United States v. Robinson*, 756 F.2d 56, 58 (8th Cir. 1985). Searching the apartment, an officer "noticed an object in [the individual's] hand and ordered him to 'drop it.' The officers then picked up from the floor a . . . .25 caliber automatic pistol . . . ." *Id.* This court noted the similarities to *Malachesen*: "officers were searching defendant's apartment for drugs under a properly issued warrant" when they found a gun. *Id.* at 60. This court held the officers were similarly justified in temporarily seizing the gun for safety purposes during the search. *Id.* Both cases indicate the challenged seizure was permissible as "a reasonable precaution" to ensure safety. *Id.*; *Malachesen*, 597 F.2d at 1234.[3]

_____

[3]*Malachesen* also noted that the plurality opinion in *Coolidge v. New Hampshire*, 403 U.S. 443, 472 (1971), "appears to suggest that the plain view exception to the warrant requirement may permit the seizure of 'objects dangerous in themselves.' We believe that a cocked and loaded gun should be considered dangerous in itself." 597 F.2d at 1234 n.4. Assuming that the "objects dangerous in

-9-

The Government's interests while executing a search warrant justify significant intrusions on individuals' Fourth Amendment interests. *See **Bailey v. United States***, 133 S. Ct. 1031, 1038 (2013). It does not necessarily follow that the *Malachesen* seizure standard applies when the police are not executing a search warrant. "The Fourth Amendment prohibits unreasonable searches and seizures. Reasonableness is always the touchstone of Fourth Amendment analysis, and reasonableness is generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." ***Cty. of Los Angeles, Calif. v. Mendez***, 137 S. Ct. 1539, 1546 (2017) (citations omitted) (internal quotation marks omitted). *See also **Michigan v. Long***, 463 U.S. 1032, 1046 (1983) (explaining courts should balance "the need to search or seize against the invasion which the search or seizure entails"). Ordinarily, the seizure of personal property is "reasonable" only pursuant to a warrant. ***United States v. Place***, 462 U.S. 696, 701 (1983). However, sometimes, "such as when faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like . . . certain general, or individual, circumstances may render a warrantless . . . seizure reasonable." ***Maryland v. King***, 133 S. Ct. 1958, 1969 (2013) (internal quotation marks omitted).

Here, Lewis's Fourth Amendment interest is his possessory interest in the handgun. *See **Place***, 462 U.S. at 705. The Government's seizure intruded on that interest. One fact heightening the intrusion is that the police took the gun from Lewis's "custody and control"—from his work area. *See **id.*** But diminishing the intrusion is the nature of the seizure. Lewis does not argue that the seizure of the handgun "effectively restrain[ed]" him. *See **id.*** at 708-09. The officers took possession of the handgun for the limited purpose of ensuring their safety while speaking to him in the work area. They deprived Lewis of possession of the handgun

themselves" rule holds, it does not apply to a holstered handgun, unconnected to criminal activity, that the police have no reason to believe is cocked or loaded.

only long enough to remove it from the holster and check to see if it was loaded. Given the narrow purpose and short time the officers seized the handgun, the intrusion on Lewis's Fourth Amendment interest was minimal.

Weighed against the intrusion is the Government's "interest in minimizing the risk of harm to the officers." *See **Bailey***, 133 S. Ct. at 1038. This is an important interest. ***Id.*** It is the same interest that primarily justifies protective frisks of suspected criminals. ***Terry v. Ohio***, 392 U.S. 1, 23 (1968) ("We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.").

The Government cites *Terry* cases in arguing the detectives permissibly seized Lewis's gun. ***United States v. Morgan***, 729 F.3d 1086, 1091 (8th Cir. 2013); ***United States v. Davis***, 202 F.3d 1060, 1063 (8th Cir. 2000). Under *Terry*, officers may conduct protective frisks where an officer reasonably concludes that "the persons with whom he is dealing may be armed and presently dangerous," and nothing in his encounter dispels "his reasonable fear for his own or others' safety." *Terry*, 392 U.S. at 30. But *Terry* applies where officers reasonably suspect *both* that they are dealing with an "armed and presently dangerous" individual *and* that criminal activity is afoot. ***Id.*** at 30; ***Morgan***, 729 F.3d at 1090 ("Taken together, these factors amount to reasonable suspicion that Morgan was engaged in criminal activity, and a reasonable belief that Morgan was dangerous."); ***Davis***, 202 F.3d at 1062 ("To be constitutionally reasonable, a protective frisk must also be based upon reasonable suspicion that criminal activity is afoot . . . ."). Here, the officers did not suspect criminal activity was afoot.

Despite the detectives' lack of reasonable suspicion that criminal activity was afoot, *Terry*'s principles are relevant here. Two government interests justify *Terry*

frisks. The "immediate interest" justifying a *Terry* frisk is officer safety. ***Terry***, 392 U.S. at 23. The other interest is investigating and preventing potentially ongoing crime. *See **id.*** at 22-23. Here, the Government's immediate interest in officer safety is the same as in *Terry*. It is more difficult to compare the Government's secondary investigatory interest. In *Terry*, the officer reasonably suspected the frisked individual was about to commit an armed robbery. *See **id.*** at 27. In some cases, the Government's investigatory interest in finding information about a criminal suspect is stronger than the investigatory interest in *Terry*—when, for instance, the police look for a murderer. In other cases—such as when police investigate nonviolent misdemeanors—its investigatory interest is weaker than in *Terry*. Ultimately, however, the Government has a strong interest in ensuring its officers' safety while they legitimately investigate any crime. *See **id.*** at 23 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.").

While the Government's interests here are similar to those in *Terry*, the intrusion on Lewis's Fourth Amendment possessory interest is substantially less significant than the intrusion on Fourth Amendment interests caused by a *Terry* frisk. *Compare **Place***, 462 U.S. at 706 (explaining "some brief detentions of personal effects may be . . . minimally intrusive of Fourth Amendment interests"), *with **Terry***, 392 U.S. at 24-25 ("Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience.").

Given the lesser intrusion on Fourth Amendment interests involved, officers may temporarily protectively seize a handgun in plain view so long as "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." ***Terry***, 392 U.S. at 27. This reasonable belief cannot be supported by an officer's "inchoate and unparticularized suspicion or 'hunch.'" ***Id.*** Rather, it must be supported by "specific reasonable inferences

-12-

which [the officer] is entitled to draw from the facts in light of his [or her] experience." *Id.* This court agrees with the standard articulated by the Sixth Circuit: "a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety." *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003).

This is consistent with this court's standard for other Fourth Amendment intrusions justified by officer safety concerns. *See United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006) ("A legitimate concern for officer safety or the safety of others may constitute an exigent circumstance, and a warrantless entry into a residence may be justified if an officer has a reasonable fear of harm."). It is also consistent with the standard other courts apply to seizures of weapons justified by officer safety concerns. *See United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014); *United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010).

Applying this standard, would a reasonably prudent person in Detective Gietzen's circumstances believe that his or her safety was in danger? The Government points to no facts supporting such a belief. The district court noted only that Detective Gietzen did not know if the gun was loaded and that in addition to the detectives and Lewis, there was a customer in the waiting area. A reasonable officer could not draw specific reasonable inferences from these facts to justify seizure of the handgun. The detectives did not suspect Lewis or the customer of any wrongdoing, nor did Lewis or the customer engage in any activity indicating they posed a threat. The detectives did not suspect others might get access to the gun. Their unparticularized suspicion that Lewis or the customer might spontaneously shoot them does not support a reasonable belief that their safety was in danger. *See Sibron v. New York*, 392 U.S. 40, 64 (1968) (fact that individual talked "with a number of known narcotics addicts" did not justify self-protective search of individual); *United States v. Hughes*, 517 F.3d 1013, 1019 (8th Cir. 2008) (officer cannot frisk individual

-13-

just "because the officer was alone and the call was vague, leaving open the possibility of dangerous situations"). *See also* **Brown v. Texas**, 443 U.S. 47, 52 (1979) (officer's belief that individual "looked suspicious" did not justify stop). The Government failed to carry its burden to show the initial warrantless seizure of the handgun was permitted.

* * * * * * *

The judgment of the district court is affirmed in part, reversed in part, and the case remanded for proceedings consistent with this opinion.

_____