# United States Court of Appeals
### For the Eighth Circuit

_____

No. 24-1324
_____

United States of America

*Plaintiff - Appellee*

v.

Jose Rolando Gonzalez

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Southern
_____

Submitted: October 25, 2024
Filed: April 4, 2025
_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.
_____

KELLY, Circuit Judge.

Jose Rolando Gonzalez entered a conditional plea of guilty to one count of conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1)

and 846, reserving the right to appeal the district court's[1] denial of his motion to suppress. After careful review, we affirm.

## I.

At 9:12 a.m. on September 25, 2022, someone called the Moody County Sheriff's Office about "a distracted or a drunk driver" who was "heading north on I-29" near exit 108. The caller identified the car as "a black, Volvo sedan of some kind," and reported that it "went onto the side on the shoulder and then went over into the left lane." The dispatch officer passed this information along to South Dakota State Trooper Chris Spielmann, who started driving toward the area.

At 9:27 a.m., someone else called the Brookings Police Department[2] to report a car "heading north" on I-29 by mile marker 127 that was "all over the road." This caller identified the car as "a black car, and black windows tinted, like you can't even see in the car," and further stated the car was "not going 80 . . . going like 65." The caller described the car as "going all the way to . . . the grass line, back over, back over," and stated that the car was "just right now going past the Alton exit," around mile marker 127.

Two minutes later, the Brookings Police Department issued a radio dispatch to all officers, informing them of "a black car weaving from grass line to grass line" that had been spotted at "I-29 mile marker 127 northbound." Spielmann radioed back that the car described in the Brookings dispatch may be the same one that "Moody County got a complaint about," and he added that it "might have been a Volvo."

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota, adopting the report and recommendations of The Honorable Veronica L. Duffy, United States Magistrate Judge for the District of South Dakota.

[2]The Brookings Police Department is located in Brookings County, which is the county immediately north of Moody County.

At the time, South Dakota State Trooper Mitchell Lang was stationed near exit 132 on I-29 north, in the median. At 9:33 a.m., Lang radioed a message, saying "I've got a black Volvo" with California plates that "just took . . . exit 132." Lang followed the car to a gas station. Lang later testified that he thought the driver had seen him and that "taking the first exit available . . . was suspicious."

Brookings Police Officer Seth Bonnema also drove to the gas station, arriving at 9:37 a.m.; he pulled in behind the black Volvo, which was parked at a gas pump. Two men were standing outside the Volvo: the driver, Jose Rolando Gonzalez, and the passenger, Marquez Gonzalez.[3] Bonnema greeted the men, and asked Gonzalez, "Can I talk to you?" After Gonzalez agreed, Bonnema explained that the reason why he was "stopping [them]" was because "some anonymous person called out on the interstate that you're all over the road." Gonzalez replied, "Oh, I might have been, yeah, I'm tired," and then stated, "I'll get some rest." Bonnema asked Gonzalez if it was okay to check his identification, and Gonzalez said yes.

As Gonzalez was looking through his wallet, Bonnema asked where he was coming from. Gonzalez said that he was coming from California. Bonnema asked, "What for?" and Gonzalez replied that he was "going to the Iowa State Fair." Bonnema repeated, "Iowa State Fair?" and Gonzalez said, "Yeah." Bonnema then stated, "You're past Iowa." Gonzalez appeared confused, and said, "No." Bonnema said, "Huh?" and then Gonzalez agreed and said, "I'm going down, yeah." Bonnema replied, "Well, you were going north on the Interstate. Iowa is . . . an hour and a half south of here."

Gonzalez then found his license and handed it to Bonnema. Bonnema continued to ask Gonzalez questions about the Iowa State Fair because, as he later testified, he "thought it was odd that the [S]tate [F]air would be held in late September, when state fairs are usually held within the summer period." Gonzalez

---

[3]To avoid confusion with Jose Gonzalez, we refer to Marquez Gonzalez as Marquez.

explained that the Iowa State Fair "starts next week" in Des Moines. When Bonnema asked why he was going so early, Gonzalez stated that he had to "set up" a "pizza wagon" for a pizzeria that operated out of Arlington, Texas. Bonnema returned to his vehicle to check Gonzalez's license. Bonnema also looked up the dates for the Iowa State Fair and learned that it had taken place in August.

A few minutes later, Bonnema got out of his patrol car and spoke to Marquez, who said he and Gonzalez were going to Minnesota before traveling back to the Iowa State Fair. Bonnema responded, "But the Iowa State Fair was August 11 through the 21st," and Marquez asked, "Are you serious?" Bonnema later testified that I-29 was a "common corridor" for drug traffickers, and he suspected the men "were using the Iowa State Fair as a cover story to cover some sort of criminal activity." Bonnema returned to his vehicle, retrieved his K-9, Gina, and walked her around the Volvo. Gina "indicated" to the odor of drugs near the driver's side door. When Bonnema asked Marquez if there were any drugs in the car, he said there was probably some marijuana.

The officers searched Gonzalez's car, where they found "approximately 32 pounds of methamphetamine," cash, drug paraphernalia, and several cell phones. Gonzalez moved to suppress the evidence seized, arguing that the officers lacked reasonable suspicion to stop his car and that the officers otherwise unlawfully extended the stop. The district court denied the motion, and Gonzalez appeals.

II.

We apply a mixed standard of review to denials of motions to suppress, reviewing "factual findings for clear error and legal conclusions *de novo*." United States v. Lewis, 864 F.3d 937, 941 (8th Cir. 2017) (quoting United States v. Ortega-Montalvo, 850 F.3d 429, 433 (8th Cir. 2017)). We will affirm the denial of a motion to suppress "unless it is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." Id. (quoting same).

A.

Gonzalez argues that the officers lacked reasonable suspicion for a Terry[4] stop because they lacked sufficient information to believe his car was the black car reported to be driving erratically on I-29. "An investigatory, or Terry, stop without a warrant is valid only if police officers have a reasonable and articulable suspicion that criminal activity may be afoot." United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010) (quoting United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999)). In determining whether reasonable suspicion justified a stop, we evaluate "'both the content of information possessed by police and its degree of reliability'. . . . tak[ing] into account 'the totality of the circumstances.'" Navarrete v. California, 572 U.S. 393, 397 (2014) (first quoting Alabama v. White, 496 U.S. 325, 330 (1990), and then quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). This standard "appl[ies] with full force to investigative stops based on information from anonymous tips." Id.

Bonnema and Lang heard the two reports of a black car heading north on I-29—the first from Brookings dispatch, and the second from Spielmann describing the earlier tip called in to Moody County. They knew from Spielmann that the vehicle might have been a Volvo. The officers also knew from the Brookings dispatch that the car was driving erratically, and they could infer from Spielmann's response that the report from Moody County described similar conduct. See Navarrete, 572 U.S. at 402 (recognizing that "weaving all over the roadway" is "sound indicia" of impaired driving (internal quotation omitted)). The location of the car in both reports was within a twenty-mile radius on I-29 north. The consistent location of the car, taken together with the corroboration of the color and erratic driving, permitted a reasonable inference that the tips were about the same vehicle. See United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001) (noting that anonymous tips can reliably support reasonable suspicion for a Terry stop when "innocent details" are corroborated). Then, Lang identified a suspect car only five

[4]Terry v. Ohio, 392 U.S. 1 (1968).

miles north, and four minutes after, the Brookings County dispatch placed the car at exit 127. Based on the consistent location and timing, the officers could reasonably infer that the vehicle stopped was the subject of the complaints.

Gonzalez points out that neither caller provided a complete description of the car, such as a license plate number or model. But the callers gave the color and precise location of the car on the highway, and they described witnessing ongoing unlawful conduct. See Navarrete, 572 U.S. at 399 (noting that a "contemporaneous report has long been treated as especially reliable"). One caller identified the car as a "black Volvo" and Spielmann shared that it might have been a Volvo over the radio. Taken together, the tips described a car driving erratically for more than twenty miles. See Wheat, 278 F.3d at 732 n.8 (noting that erratic driving generally poses an "imminent danger" which can justify a stop based on less corroboration of information than other types of criminal activity). Notably, both callers also called 911 to report the erratic driving, which is a marker of reliability. See Navarette, 572 U.S. at 400–01 (calling 911 may be an "indicator of veracity" because the calls "can be recorded" and "verif[ied]"). Considering the totality of the circumstances, see id. at 397, the officers had reasonable suspicion to conduct the Terry stop here.

B.

Gonzalez also argues that Bonnema unlawfully prolonged the stop beyond its initial purpose. "An officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." United States v. Chavez Loya, 528 F.3d 546, 553 (8th Cir. 2008) (citing United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007)).

Gonzalez's responses to Bonnema's questions, asked while Gonzalez was looking for his license, were sufficiently suspicious for Bonnema to expand the scope of the stop beyond the traffic violation. Gonzalez's stated destination of Iowa contradicted his location—already about an hour and a half north of Iowa and headed

further north. And Gonzalez's explanation that the two men were headed to the Iowa State Fair was suspicious because it was late September. This illogical itinerary and suspect reason for travel provided reasonable suspicion for Bonnema to ask additional questions and to confirm the date of the State Fair. See Lyons, 486 F.3d at 372 (finding that an officer developed reasonable suspicion during a traffic stop based on the defendant's "unusual itinerary," "contradictory descriptions," and "amount of luggage"). In addition, Gonzalez was travelling from California, and Bonnema had experience with I-29 as a common corridor for narcotics. See United States v. Arvizu, 534 U.S. 266, 273 (2002) (officers may "draw on their own experience and specialized training" to support reasonable suspicion).

After looking up the Iowa State Fair and finding that it had already taken place several weeks earlier, it was reasonable for Bonnema to question Marquez about the men's itinerary to compare the stories. And Marquez's assertion that the two were going to Minnesota first, and then heading to the Iowa State Fair, did not match Gonzalez's account. Taken together, the implausible and contradictory itineraries, Gonzalez's admitted, erratic driving, and Bonnema's experience with drug trafficking along I-29 gave Bonnema reasonable suspicion to further expand the scope of the stop to walk Gina around Gonzalez's car.

III.

We affirm.

_____